SEYMOUR E. SPILKA, DOING BUSINESS AS GENERAL FACTORS COMPANY, PLAINTIFF-APPELLANT, v. SOUTH AMERICA MANAGERS, INC., A NEW JERSEY CORPORA-TION, AND SUL-AMERICA TERRESTRES, MARITIMOS E ACIDENTES COMPANHIA DE SEGUROS, RIO DE JA-NEIRO, DEFENDANTS-RESPONDENTS.

Argued May 5, 1969—Decided July 23, 1969.

454

*Mr. George Clott* argued the cause for plaintiff-appellant (*Messrs. O'Brien, Tartalsky & Clott,* attorneys; *Mr. Clott,* on .the brief).

*Mr. Allen C. Mathias* argued the cause for defendant-respondent Sul-America etc. (*Messrs. Stevens & Mathias,* attorneys; *Mr. Mathias,* on the brief).

*Mr. Marvin A. Sachs* argued the cause for defendant-respondent South America Managers, Inc. (*Messrs. Feuerstein & Sachs,* attorneys).

The opinion of the court was delivered by

HALL, J. Plaintiff, the owner of a financing business and the assignee of the insureds in certain insurance policies issued by defendant Sul-America ("SATMA" or "the insurer") through its general agent, defendant South America Managers, Inc. ("SAMI" or "the agent"), and a broker, one Wallace ("the broker"), brought suit to recover from either or both defendants unearned premiums on the policies resulting from their cancellation. The action was instituted in the Chancery Division. Plaintiff, not knowing the precise amounts of such premiums, demanded disclosure and an accounting as well as a judgment for payment. The trial court concluded that neither defendant was liable to plaintiff, except as to the sum of $1,520.56, which the agent owed the broker and which the court directed be paid to plaintiff. The Appellate Division affirmed in an unreported opinion and we granted certification on plaintiff's petition. 53 *N. J.* 223 (1969).

The essential facts are not in dispute. The insurer, SATMA, is a Brazilian corporation engaged in the general insurance underwriting business and duly licensed to do business in New Jersey. The agent, SAMI, a New Jersey corporation with its principal place of business in Newark, is a duly licensed insurance agent and surplus line broker

in New Jersey. At the times involved it was the insurer's exclusive manager and general agent in the United States, with full power, pursuant to an agency agreement, to bind all forms of surplus lines insurance on behalf of SATMA and to cancel all insurance so bound. The agent acknowledged in the agreement that all premiums it collected are trust funds belonging to the insurer and that its duties and obligations with respect thereto shall be those of a trustee under the laws of the State of New Jersey. The insurer agreed to allow the agent a total commission of 30% calculated on all premiums — less return premiums — it paid to the insurer, plus federal tax of 4% on all direct writings.

The agent was also authorized to enter into exclusive "correspondents' agreements" with brokers throughout the country for the placing of business through the agent for acceptance by the insurer. It had such an agreement with Wallace, a duly licensed broker in Atlanta, Georgia. Under the agreement the agent agreed to pay the broker a commission of 20% (out of the 30% the agent received from the insurer) on such business, plus 4% allowance for federal tax stamps, and the broker agreed in turn to ratably refund to the agent commissions attributable to cancelled policies or reduced premiums. The practice was for the insurance policy to be sent by the agent to the broker for delivery to the latter's customer, the insured, and for the broker to collect the premium and remit the same to the agent. (This correspondents' agreement, in effect, so provided and directed.) Apparently it was also customary for the broker to act as the conduit for any return premiums or other credits due an insured from the insurer. Such payments were transmitted to him by the agent (who in turn had received them from the insurer), and turned over to the insured.

All financial transactions between the insurer and the agent for premiums or other charges on the one hand and return premiums or other credits on the other, with due allowance for commissions, were handled by a monthly

bordereau — a statement of account listing all transactions. If the balance indicated thereon was in the insurer's favor, the agent would send it a check for the appropriate amount, and vice versa if monies were due the agent. The same procedure was employed as between the broker and the agent. This method of remittance is known as the "account current system" and is said to be the prevalent system in the trade.

This case is concerned with 27 insurance policies issued by the insurer, SATMA, through the agent, SAMI, and the broker, Wallace, and cancelled during 1962 and 1963.[1] The policies were high risk motor vehicle damage policies (ordinarily written only by surplus line carriers) issued to insureds in the broker's business area. All of them contained the usual provision permitting cancellation by the insured or the insurer at any time, in which event, it was further provided the insured was entitled to the return, from the insurer, of the unearned premium.

Apparently the insureds either could not or did not desire to pay the full amount of the premium on these policies. The broker therefore made arrangements in each case with plaintiff, whose factoring business was located in Fort Dodge, Iowa, to finance the portion of the premium unpaid by the insured. This was accomplished in each case by the entering into of a "Premium Financing Contract" between the insured and the broker, on forms furnished by plaintiff, which set forth the details of the insurance policy, and provided for installment payments of the balance, plus financing charges. The contract was accompanied by a "premium note" executed by the insured, both of which were forwarded to plaintiff following their assignment to him by the broker. The premium note provided that the broker would notify plaintiff if the policy was cancelled and "pay to [plaintiff]

---

[1] Apparently the notices of cancellation were sent by the agent on behalf of the insurer pursuant to the authority granted in the agency agreement. The record is not clear as to the reason for or as to the party instigating the cancellations. In our view this is immaterial.

an amount equal to the full unearned premium (including commissions thereon) or direct the insurer to do so."

Further, the note gave notice to the insured that the broker intended a transfer of it to plaintiff, and, in addition, set forth the following assignment by the insured, which is pivotal in this case:

"To secure payment of this note to the holder hereof, the undersigned [the insured] hereby assigns to [plaintiff] each policy described on the reverse side hereof, and every kind of right, payment or refund incident thereto which may exist at any time until this note shall have been fully paid, including (but not limited to) unearned premiums, premium refunds, dividends, savings, shares of surplus, or loss payments under any policy."

The document further empowered plaintiff to receive all such sums, and to cancel or effect cancellation of the policy, and authorized the insurer to make all such payments to plaintiff.

Upon receipt of these documents, plaintiff gave notice thereof to the insurer through the agent on forms he had composed for that purpose. The notice read, in part:

"The Assured in the policy described above has requested that we finance the premium thereon and has sent us a proposed Premium Installment Contract pledging the unearned premiums and losses payable under the policy, when such losses deplete the unearned premium, to secure the Balance Due under the contract.

"The Premium Installment Contract appoints this Company or the holder thereof irrevocably attorney-in-fact to act for the assured as long as any sum remains due on the contract with the following powers: to pay the premium balance to the Insurance Company mentioned; to cancel and surrender the policy, to collect all unearned premiums or the amount of any loss payable under said policy, to the extent necessary to satisfy this obligation; to execute any lost policy receipts necessary to effect cancellation and collect unearned premiums; to sign, execute and deliver any document, notice or receipt necessary or proper to effect any of the foregoing powers.

"We will finance the premium in the aforesaid manner if you will assure us the policy is issued in accordance with the description shown above and that you will recognize our authority under the aforementioned power of attorney as therein set forth by signing the attached card and returning to us within 10 days.

"The amount financed will be paid to the issuing agent unless you immediately direct otherwise."

(The insurer did not direct payment by plaintiff otherwise as to any of the policies here involved.)

■ To each notice was attached a prepaid post-card, addressed to plaintiff, which stated in pertinent part:

"This will acknowledge receipt of your Notice of Premium Financed covering our Policy(ies) No. (s)——— under your account No. ——— and our acceptance of the terms as outlined therein."

In the case of each policy here involved, the post-card was returned to plaintiff, signed in the name of the insurer by the agent. This procedure amounted legally at least to a notice to the insurer of the assignment of return premiums by the insured to plaintiff, and the insurer's acknowledgment thereof.

Upon receipt of the return post-card, plaintiff paid the broker the balance of the premium,[2] which the latter was supposed to remit to the agent (less his commission) for the insurer, by means of his respective monthly bordereaux. In fact, however, the broker remitted to the agent the premiums on only 17 of the 27 policies and did not pay in full, or in some cases at all, the premiums on the remaining 10. The agent, though, by its respective monthly bordereaux with the insurer credited, and therefore paid to it the full premiums (less commissions) on all the policies. In effect, therefore, the agent personally extended credit to the broker for the premium amounts it had not received from him.

All would have worked out well had not the broker become financially embarrassed and eventually bankrupt, and unable to pay the agent the premiums he owed on these 10 policies,

---

[2] The testimony indicated that in at least one instance the plaintiff paid the premium balance to the broker before he received the return post-card. In view of the basis upon which we decide the case, nothing turns on this fact. See footnote (7), *infra*.

as well as on others not involved, and which the agent had advanced to the insurer.

As these 27 policies were cancelled, the agent took credit on its monthly bordereaux with the insurer for unearned premiums totaling $20,028.69, $15,754.36 of which was attributable to the 17 policies which had been paid in full by the broker, and $4,274.33 of which was attributable to the 10 policies for which it had not received full payment.[3] This credit constituted payment of the unearned premiums in this amount by the insurer to the agent.[4] The agent, however, — and this is what gives rise to the present action — did not pay anything to plaintiff, but set off the amount so credited against the sums the broker owed it. The return premiums were thereby exhausted except for $1,520.56, the sum which the trial court ordered paid by the agent to plaintiff, no one else having claimed it. At the time of trial the premium financing contracts of the 27 policyholders were apparently in default and plaintiff was owed thereon a total of $22,524.

To complete the factual picture, it should be noted that before this suit came to trial the insurer and the agent terminated their relationship by a written agreement, included in which was a provision that the insurer agreed to pay return premiums which might become due on policies issued prior to the date of the agreement.

---

[3] We see no distinction, as far as this case is concerned, between the two categories of policies.

[4] We are under the impression, however, from the record that the unearned premium figures mentioned are not, by reason of the commissions previously deducted, the full amounts due to the insureds (or plaintiff as their assignee). As noted earlier, the policies provided that upon cancellation the insured was entitled to the return of the unearned premium. Clearly this means the entire unearned premium, as that term is defined in the policy, without any deduction for commissions attributable to it. *153 West 33rd Street Corp. v. Reliable Insurance Co.*, 55 N. Y. Misc. 2d 983, 286 N. Y. S. 2d 694 (*N. Y. C. Civil Ct.* 1967). If such commissions were deducted, the correct gross amount should be determined on the remand which we shall direct.

On this state of facts the trial court and the Appellate Division found no liability to plaintiff by either defendant (except to the extent of the $1,520.56 previously mentioned). The trial court held that there was a lack of proof of an effectual contractual relationship between plaintiff and either defendant and the intermediate appellate tribunal also referred to "equitable considerations" against plaintiff, without spelling them out. We believe both courts erred. There is no necessity for a separate contractual relationship between plaintiff-assignee and the insurer or its agent, nor do we find any "equitable considerations" militating against plaintiff. Both defendants conceded at oral argument that one or the other would be liable if the insureds, instead of plaintiff, were suing for the return premiums. Indeed their briefs in this court argue little of substance in support of the result reached below;[5] a large part of each brief is devoted to the contention that liability should be imposed only against the other defendant. Once the two chains of relationship which we have outlined and their legal incidents are understood, we think it plain that plaintiff is entitled to recover from the insurer.[6]

---

[5] The insurer argues here that there was a lack of proof of effective assignments by the insureds to plaintiff, and also the absence of satisfactory proof that plaintiff paid the broker the full amount of the unpaid portions of the premiums involved. Neither contention or issue was asserted in the pretrial order and the trial court properly rejected the insurer's attempt at trial to delve into the effectiveness of the assignments. In any event, there was evidence that none of the insureds had in any way ever questioned the assignments. Moreover, at oral argument before us, plaintiff's attorney offered to make available to the insurer's attorney any proof necessary to dissipate the insurer's concern in these respects. We have not been advised that the insurer's attorney is not now satisfied in this connection and hence they are not issues in this case.

[6] The agent cross-claimed against the insurer for any sums that might be adjudged due from it to plaintiff, based upon the clause in the agency termination agreement previously referred to whereby the insurer agreed to pay all return premiums that might become due. There is no corresponding cross-claim by the insurer against the agent based upon the bookkeeping payment of these return premiums by it to the agent. Liability as between the defendants

We are of the opinion that the appropriate basis of his recovery is as the insureds' assignee of the return premiums.[7] There can be no doubt that the assignments were for a valuable consideration. As such assignee, he became vested with all existing choses in actions of the assignor and, as a so-called equitable assignee, with all monies that might become due, subject only to such defenses as were available against the assignor before notice of the assignment. Notice charges a debtor with the duty of payment to the assignee and payment to any other person will not relieve him of liability to the assignee. *Russell v. Fred G. Pohl Co.,* 7 N. J. 32, 40 (1951) ; *Burke v. Hoffman,* 28 N. J. 467, 473–474 (1958).[8] It cannot be disputed here that the insurer, and its agent as well, had proper notice of the respective assignments by the insured to plaintiff. Indeed, this was verified by acknowledgments to plaintiff in each instance. And, as far as the insurer or the agent was

can be determined upon the remand upon the filing of appropriate supplemental pleadings.

[7] He would also be entitled to recover on the theory of an independent contract with the insurer, represented by the previously quoted notice to the insurer's agent and the latter's acknowledgment and acceptance thereof through the return post-card, except in such instances where premium payments were made by him to the broker before the post-card was received. *State Investment Company v. Cimarron Insurance Co.,* 183 *Kan.* 190, 326 *P. 2d* 299 (1958) ; *Citizens State Bank v. Travelers Indemnity Co.,* 7 *Wis. 2d* 451, 96 *N. W. 2d* 834 (1959). Although neither theory was specifically spelled out in the complaint or pretrial order, both were adverted to by plaintiff during the trial, and his briefs in the Appellate Division and this court have relied upon the assignee thesis. The trial court decided the case on the independent contract basis and was in error in the result reached thereon. The practical difference between the two theories is that under the assignee theory, the validity of the assignment may be put in issue, whereas under the independent contract theory the court might not be concerned with the validity of the assignment out of which the separate contract arises. See *State Investment Company v. Cimarron Insurance Co.,* *supra.* See footnote (5), *supra.*

[8] It is not intimated by anyone that the law of any other state but New Jersey applies to any aspect of the case.

concerned, there were no defenses available against the insureds-assignors before notice of the assignments.

Furthermore, the situation is not affected by the fact that the broker did not remit to the agent all of the premiums which he received from plaintiff. Quite apart from the additional fact that the agent paid the insurer the full amount of the premiums even though it had not received the same from the broker, it is clear, under the circumstances here, that the broker was the agent of the insurer for the receipt of premiums, even though he was also the agent of the insured in procuring the insurance, and, thus, payment to him legally amounted to payment to the insurer. By virtue of the agency agreement between the insurer and the agent and the correspondents' agreement between the agent and the broker, the broker was duly authorized by the insurer to deliver policies to his customers and to receive and collect the premiums therefor. This is the general rule. 14 *Appleman, Insurance Law and Practice,* § 7985 (1944); *Midwest Transfer Co. v. Preferred Accident Insurance Co.,* 342 *Ill. App.* 231, 96 *N. E.* 2d 228 (*App. Ct.* 1951); *Maloney v. Rhode Island Insurance Co.,* 115 *Cal. App.* 2d 238, 251 *P.* 2d 1027 (*Cal. Dist. Ct. App.* 1953). New Jersey now has a statute so providing, adopted after the issuance of the policies involved here, *N. J. S. A.* 17:22–6.2a, *L.* 1966, c. 50, but our courts have held that the statute merely codified existing common law. *Mt. Vernon Fire Insurance Co. v. Gillian,* 95 *N. J. Super.* 279 (*App. Div.* 1967). See also *Kubeck v. Concord Insurance Co.,* 103 *N. J. Super.* 525 (*Ch. Div.* 1968); *Seabrook Farms, Inc. v. Commercial Insurance Co.,* 104 *N. J. Super.* 419 (*Ch. Div.* 1969). Representative cases prior to the statute supporting the basic proposition are *Bohlinger v. Ward & Co.,* 34 *N. J. Super.* 583, 591 (*App. Div.* 1955), affirmed 20 *N. J.* 331 (1956); *Reck v. Prudential Insurance Co.,* 116 *N. J. L.* 444 (*E. & A.* 1936); *Zriny v. Hartford Fire Insurance Co.,* 10 *N. J. Misc.* 181, 158 *A.* 430 (*Sup. Ct.* 1932). The soundness of the rule is obvious. It would be grossly inequitable to compel an in-

sured to follow premium monies in order to see that they are actually received by the insurer when they had been paid to one who had actual or apparent authority from the insurer to receive them. Therefore there can be no question that the premiums on the 27 policies were paid in full.

█ █ It is equally elementary that, upon cancellation of an insurance contract by either party to it, the obligation *rests on the insurer to pay to the insured* the unearned premium called for by the terms of the policy. *Bohlinger v. Ward & Co., supra* (34 *N. J. Super.,* at 591) ; *153 West 33rd Street Corp. v. Reliable Insurance Co., supra* (256 *N. Y. S. 2d,* at 695–696) and cases cited therein ; 45 *C. J. S., Insurance,* § 451, *p.* 100. That obligation is not met where the insurer pays its agent, intending transmittal to the insured, if the money does not ultimately reach the insured. If an insurer chooses to make such payment to someone other than the insured, it does so at its peril. Consequently it follows that an insurer's agent may not set off against unearned premiums, received from the insurer for transmittal to the insureds, amounts owed it by a broker with respect to which the insureds or their assignee have no legal connection or responsibility. Therefore the primary liability here is that of the insurer, SATMA, and judgment for the appropriate amount of the unearned premiums (see footnote (4), *supra*), together with interest from the date of cancellation in each instance, should go against it.[9] If that amount exceeds the amount due from the insureds to the plaintiff under the financing contracts, the plaintiff is obligated to remit the excess to the respective insureds pursuant to the provisions of the premium notes.

The judgment of the Appellate Division is reversed and the case is remanded to the Chancery Division for further

_____

[9] It is not suggested that plaintiff will be unable to collect readily from the insurer, since it is licensed to do business in New Jersey. However, if any such difficulty should become apparent upon the remand, the trial court, as a court of equity, may direct relief against the agent as well, in the light of the bookkeeping payment by the insurer to the agent.

proceedings in conformity with this opinion. Costs to the plaintiff.

*For reversal and remandment* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN — 7.

*Opposed* — None.