634 A.2d 74

SEARS MORTGAGE CORPORATION, PLAINTIFF–RESPONDENT, v. MICHAEL ROSE AND EMERY KAISER, DEFENDANTS AND THIRD–PARTY PLAINTIFFS–APPELLANTS, AND MRS. MICHAEL ROSE, WIFE OF MICHAEL ROSE; MRS. EMERY KAISER, WIFE OF EMERY KAISER; GENERAL INVESTMENT CORP., A CORPORATION OF NEW JERSEY; THEODORE JANULIS & HELEN JANULIS; STANLEY H. SPRAGUE; MORBACH–KASLANDER CO., INC., A N.J. CORP.; DEL'S ELECTRIC INC.; TURNER LUMBER COMPANY, INC.; NATIONAL SIDING CORP., A N.J. CORP.; LAKEVIEW CONDOMINIUM ASSOCIATION, DEFENDANTS, v. COMMONWEALTH LAND TITLE INSURANCE COMPANY, THIRD–PARTY DEFENDANT–RESPONDENT, AND JOSEPH F. GILLEN AND TRW, THIRD–PARTY DEFENDANTS.

Argued February 16, 1993—Decided July 29, 1993.

328

*Peter D. Ciancia* argued the cause for appellant Emery Kaiser.

*Richard M. Fricke* argued the cause for appellant Michael Rose (*Daniels & Solomon,* attorneys).

*Ben J. Slavitt* argued the cause for respondent Commonwealth Land Title Insurance Company (*Slavitt, Fish & Cowen*, attorneys; *Ronald G. Schecter*, on the brief).

*Elizabeth J. Sher* argued the cause for respondent Sears Mortgage Corporation (*Pitney, Hardin, Kipp & Szuch*, attorneys; *Ms. Sher* and *Loryn P. Riggiola*, on the brief).

*Daniel R. Hendi*, Deputy Counsel, submitted a letter in lieu of brief on behalf of *amicus curiae* New Jersey Lawyers' Fund for Client Protection (*Kenneth J. Bossong*, Director, attorney).

*John R. Weigel* submitted a letter in lieu of brief on behalf of *amicus curiae* New Jersey Land Title Association.

The opinion of the Court was delivered by

HANDLER, J.

In this case and the companion case, *Clients' Security Fund v. Security Title & Guarantee Co.*, 134 *N.J.* 358, 634 *A.*2d 90 (1993), also decided today, the Court must determine which party participating in the closing of a real-estate title must ultimately sustain the loss caused by the closing attorney's theft of moneys earmarked for the payment and satisfaction of an existing first mortgage on the property. The parties with an interest in the closing are, on the one hand, the title-insurance carrier and, on the other hand, those furnishing the money to acquire the property— in this case, the buyer and, in the companion case, an institutional third-party lender. As a result of the closing attorney's embezzlement, one of those parties must ultimately bear the loss. Further, because the attorney's misappropriation prevented the payment and satisfaction of the existing mortgage on the property, we must consider as well the status and rights of the party holding that mortgage.

It is highly regrettable that closing attorneys, as exemplified by these cases, from time to time abscond with the moneys entrusted to them for purposes of the closing of title. That form of misappropriation is a recurrent basis for disbarment. The appeals, therefore, provide the opportunity for the Court both to

enunciate a rule to govern liability in this kind of transaction and, further, to suggest sound practices and ethics standards that may serve to reduce the incidence of this serious misconduct.

## I

In 1985, Michael Rose purchased a residential condominium in Leonia. On the same day, he gave a purchase-money mortgage for $107,950 to Allstate Enterprises Mortgage Corporation, the predecessor corporation to Sears Mortgage Corporation ("Sears").

On August 3, 1987, Emery Kaiser contracted to buy Rose's condominium for $165,000. Because Kaiser was paying with cash, the "Rose to Kaiser" contract did not contain a mortgage-contingency clause. At the same time, Kaiser was preparing to sell his home, which would provide the funds for his purchase of Rose's condominium. Kaiser retained an attorney to represent him in both the sale of his home and the purchase of Rose's, but the attorney became seriously ill before either transaction took place. Subsequently, a real-estate broker involved in the transaction recommended that Kaiser retain Joseph Gillen, an experienced real-estate attorney, to represent him. Kaiser spoke to Gillen over the phone twice, but did not meet him until the day of the closings.

Gillen, who had a longstanding business relationship with Commonwealth Land Title Insurance Company ("Commonwealth"), wrote to Commonwealth on a standard form provided by the company, requesting a title-insurance policy for Kaiser in the sum of $165,000. He also wrote to Sears, requesting a mortgage payoff statement.

Commonwealth conducted a title search and sent Gillen its title insurance commitment, which listed Gillen as "applicant" and Kaiser as "proposed insured." The cover sheet of that document stated that the commitment "is issued to show the basis on which we will issue a Title Insurance Policy to you. The Policy will insure you against certain risks to the land title, subject to the limitations shown in the Policy." The cover sheet also stated in

bold capital letters: "You should read the commitment very carefully.... If you have any questions about the Commitment, contact the local office issuing this commitment."

On the second page of the title-insurance document, Commonwealth set out the terms of the commitment and provided that the policy would be subject to the requirements of Schedule B–1. Those requirements were payment of the purchase price to the seller, payment of the premium for the policy, proper signing of a proposed deed from Rose to Kaiser, and that the mortgage from Rose to Sears be "paid and cancelled of record."

Despite the language of that document, which is directed to the insured, Commonwealth sent it only to Gillen, along with an invoice for $704.25, covering title-commitment charges and the insurance premium. The invoice was made out to Gillen but referred to Kaiser as the "buyer/client."

On the morning of October 16, 1987, Kaiser closed on the sale of his house and received a net-proceeds check of $127,000. He endorsed the check over to Gillen's trust account. Gillen was to use the funds to purchase the Rose condominium for Kaiser that afternoon. Kaiser also wrote personal checks to Gillen totaling $38,000 to cover the balance of the $165,000 purchase price of the Rose condominium. The "Rose to Kaiser" closing took place at Gillen's law office. Kaiser was given a credit against the purchase price in the amount of the outstanding balance on the Sears mortgage, $107,155.62. Rose's attorney, Kaiser, and Gillen agreed that Gillen would pay off the mortgage, as provided in the contract of sale. Gillen also collected from Kaiser $704.25 to pay Commonwealth its title insurance premium. He told Kaiser that in return for this fee he would be getting free title to the property.

On October 17, 1987, on a form provided by Commonwealth, Gillen informed the insurance company that the closing had taken place and asked it to perform its final search and issue a fee policy. The form also stated: "all open items which are not to appear as exceptions on [the] policy have been disposed of...."

Gillen also noted on the form that a check for $704.25 was enclosed. Commonwealth received and deposited the check.

Gillen never sent any funds to Sears to pay off the Rose mortgage. He misappropriated the closing funds from that transaction and from two others, absconded, and was later criminally convicted, imprisoned, and disbarred. The other two thefts involved purchasers who had obtained mortgages. Commonwealth paid off those mortgages in order to satisfy its closing-protection obligation to the lenders.

In November 1987, Sears communicated with Rose's lawyer and Commonwealth to let them know that the mortgage on Rose's condominium had not been paid off. On December 1, 1987, Commonwealth directly communicated with Kaiser for the first time. It wrote to him that "as you are aware," Commonwealth had been "requested to provide title insurance to you in connection with your purchase" from Rose. The letter continued:

> [A]s of this writing the requirements of our title commitment have not been met. No insurance will be issued to you until such time as all the requirements of the commitment have been fulfilled. We have been informed that a mortgage made by your grantor has not been cancelled of record and we have reason to believe the same was never paid off by your closing attorney. I can advise you that Joseph Gillen has been temporarily suspended from the practice of law by the Office of Attorney Ethics as of November 23, 1987.
>
> I suggest you retain an attorney immediately as this is a very serious matter.

Commonwealth offered Kaiser a title policy subject to an exception for the Sears mortgage. Kaiser demanded that Commonwealth issue a policy free of the Sears mortgage exception. Commonwealth refused, stating that its title commitment expressly conditioned issuance of the policy on payment of the Sears mortgage.

Kaiser then asked the New Jersey Lawyers' Fund for Client Protection ("the Fund") to reimburse him for the amount Gillen had stolen. The Fund told Kaiser that it would not be able to indemnify him because it believed that he had legal recourse against Commonwealth, and thus was barred under *Rule* 1:28–3(b)(5), which permits the trustees of the Fund to consider "[t]he

potential for recovery from a collateral source" in determining whether an "eligible claim merit[s] reimbursement from the Fund."

Sears filed a foreclosure complaint in the Chancery Division on April 14, 1988. Kaiser and Rose separately answered and filed third-party complaints naming Commonwealth and Gillen as third-party defendants. Commonwealth filed answers to Rose's and Kaiser's third-party complaints and cross-claimed against Gillen, Rose, and Kaiser.

Commonwealth moved for summary judgment to dismiss Kaiser's third-party complaint. The trial court denied the motion in order to get a "full picture of the relationships among title insurance company, closing attorney and purchaser on which the question of Commonwealth's liability might well turn." The Fund and the New Jersey Land Title Association ("NJLTA") were permitted to participate at the trial as *amicus curiae*. The Fund contended that it was not required to reimburse Kaiser for the loss because it had resulted from an insurable risk, that it was subject to the collateral-source rule, and that it was subject to payment limits. Several expert witnesses in title-insurance law, real-estate practices, and south Jersey closing practices testified at the trial.

The trial court held that Commonwealth was liable to Kaiser for breach of its duty of good faith, fair dealing, and full disclosure. The court also found that Gillen had been Commonwealth's agent in its dealings with Kaiser and thus Commonwealth would be liable for Gillen's misconduct under the law of agency. The court ordered Commonwealth to pay off the Sears mortgage and to issue Kaiser an owner's title-insurance policy free of the Sears mortgage encumbrance. It also denied Sears a judgment of foreclosure and ordered Commonwealth to pay Rose's and Kaiser's attorney's fees. Commonwealth appealed and Sears cross-appealed.

The Appellate Division reversed the trial court judgment. It refused to impose liability on Commonwealth because Kaiser's

insurance policy did not include a provision protecting him against the risk of attorney defalcation, and because Gillen was Kaiser's, not Commonwealth's, agent. The court granted Sears the right to foreclose on the condominium and denied an award of counsel fees to Rose and Kaiser. It urged the Fund to act promptly in order to mitigate the harm to Kaiser.

We granted Kaiser's and Rose's petitions for certification. 130 *N.J.* 393, 614 *A.*2d 616 (1992).

## II

This case turns on the specific relationships between the parties and the roles and responsibilities of the several parties in completing a real-estate-title closing. We therefore consider, first, whether those relationships implicate principles of agency that should govern the resolution of this controversy. The issue under such an analysis is whether a closing attorney who has been retained by the purchaser may properly be found to be the agent of the title-insurance company for the purpose of applying the purchase moneys to satisfy and cancel an existing mortgage, securing clear title for the purchaser, and obtaining from the carrier a title-insurance policy covering that title. As noted, although the trial court did not rely on agency principles as the primary basis of its determination, it did find that Gillen was Commonwealth's agent in its dealings with Kaiser and thus that Commonwealth would be liable for Gillen's misconduct under the law of agency.

An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent. *Arcell v. Ashland Chem. Co.*, 152 *N.J.Super.* 471, 494–95, 378 *A.*2d 53 (Law Div.1977); 2A *C.J.S. Agency* § 37 (1972); *Restatement (Second) of Agency* § 1 (1958). There need not be an agreement between parties specifying an agency relationship; rather, "the law will look at their conduct and not to their intent or their words as between themselves but to their factual relation." *Henningsen v. Bloomfield Motors,* 32 *N.J.* 358, 161 *A.*2d 69 (1960) (finding agency relation-

ship between auto manufacturer and car dealer). "Implied authority may be inferred from the nature or extent of the function to be performed, the general course of conducting the business, or from particular circumstances in the case." *Carlson v. Hannah,* 6 *N.J.* 202, 212, 78 *A.*2d 83 (1951). Even if a person is not an "actual agent," he or she may be an agent by virtue of apparent authority based on manifestations of that authority by the principal. *See C.B. Snyder Realty Co. v. National Newark Banking Co.,* 14 *N.J.* 146, 154, 101 *A.*2d 544 (1953); *Restatement (Second) Agency* § 8 (1958). Of particular importance is whether a third party has relied on the agent's apparent authority to act for a principal. *N. Rothenberg & Son v. Nako,* 49 *N.J.Super.* 372, 382–83, 139 *A.*2d 783 (App.Div.1958). Moreover, direct control of principal over agent is not absolutely necessary; a court must examine the totality of the circumstances to determine whether an agency relationship existed even though the principal did not have direct control over the agent. 2 *C.J.S. Agency* § 36, at 599–600 (1972).

■ Critical to the question of agency in this case are the specific role and functions undertaken by the closing attorney and the extent to which those activities were authorized and directed by the title-insurance company and served its specific purposes in the title closing. The backdrop to our consideration of those factors is the importance of real-estate title insurance and the essential involvement and participation of title insurers in completing the transfers of real-estate titles.

In addressing those matters, we note that the closing in this case took place in Bergen County, in the northern part of the state. (The division between north and south Jersey was described at the trial as roughly paralleling the division between telephone area codes in New Jersey—201 [now 201 and 908] and 609.) The locale is significant because it sheds light on the function of title-insurance carriers in effectuating real-estate closings, the role and responsibilities of the closing attorney with

respect to obtaining title insurance, and the relationship between the attorney and the title-insurance carrier.

Title insurance is essential in both north and south Jersey real-estate closings. The basis for title insurance and the extent of title-insurance coverage are determined by the status of the title, which, in turn, is determined by a "search" of title. In almost all real-estate closings throughout the State the title-insurance carrier conducts the search of the title and determines the extent of title-insurance coverage. Based on that search, the insurance carrier issues a commitment for title insurance. That commitment reflects the nature and extent of insurance coverage that the carrier will provide upon the closing of title.

At all New Jersey closings, the role of the seller's attorney is fairly settled. That attorney delivers a properly executed deed and all other documents required of a seller to transfer title and possession, and confirms that the correct amount of money is obtained from the buyer and delivered to the seller. In all closings throughout the State in which the purchaser has an attorney, that attorney makes sure that the buyer brings the correct amount of money to the closing and that the charges to the buyer have been properly calculated. The buyer's attorney also receives a copy of the title-insurance commitment from the title insurer. Beyond those functions, however, practices vary markedly in the north and south with respect to the presence and role of the buyer's attorney at a real-estate closing.

In south Jersey, many, if not most, purchasers do not have their own attorneys. The title company's representative, a "title agent," attends the closing. The title agent, the expert witnesses tell us, presides over the closing as someone like a "cruise director." Title insurers maintain escrow accounts for the purpose of holding funds necessary to complete the closing, remove all exceptions, and secure clear title. The agent undertakes to remove exceptions from the title commitment and accepts the deed and mortgage and other documents incidental to title. The agent disburses all funds to complete the closing. He or she also

attends to the paying off and discharging of any existing liens; with respect to any mortgage the agent obtains a payoff statement and sends the appropriate check to the mortgagee to satisfy the mortgage and then records the cancellation or discharge of the mortgage. The title agent also authorizes the issuance of the title-insurance policy. Even when the buyer has an attorney at a south Jersey closing, the title agent still performs those functions. Although the title-insurance company charges south Jersey buyers about $100 to $150 for sending a title agent to the closing, the total extra cost to south Jersey buyers is negligible, possibly because the buyer's attorney, who has fewer responsibilities at the closing, charges a lower fee.

In contrast, in north Jersey, title-insurance carriers do not use their own employees or "title agents" to supervise real-estate-title closings. They rely, instead, on the attorney for the purchaser, whom they must approve, to perform the functions of the title agent. The buyer's attorney in north Jersey acts as the representative of, and performs the functions for, the title insurer in the same way as does the title agent in south Jersey. All communication with title-insurance companies with respect to the purchaser are directed to the purchaser's attorney. The buyer's attorney will accept the deed and necessary title and closing documents from the seller. He or she will remove all exceptions to the title according to the title commitment. The buyer's attorney disburses all moneys; he or she will withhold a portion of the purchase price to satisfy outstanding liens and, with respect to any existing mortgage, obtain the mortgage-payoff statement, transmit the appropriate funds to the mortgagee, and receive the cancelled mortgage for recording. The attorney will authorize the issuance of title insurance.

This case illustrates the north Jersey practice. The evidence indicates that if a buyer communicates with Commonwealth directly about obtaining insurance, Commonwealth advises the buyer to have an attorney submit the application. The company will insist that the attorney be "approved." Commonwealth requests infor-

mation from and gives instructions to the attorney as it would through its own title agents in south Jersey. Insurance commitments by Commonwealth in north Jersey are very rarely issued directly to purchasers. It issues the title-insurance commitment in the name of the attorney, referred to as the "applicant," and addresses the invoice to the attorney. Commonwealth also relies on the attorney to authorize the issuance of a title-insurance policy. If the attorney does not pay the premium, the policy is not issued; the company does not communicate with proposed insureds to tell them that the premium has not been paid and that they are not insured. It simply sends the attorney a reminder from time to time that the bill has not yet been paid.

The role of the closing attorney as a title agent in north Jersey is not markedly different even in those relatively infrequent situations in which a title agent is present, which does not occur unless his or her presence is specifically requested. Commonwealth does not inform its insureds in north Jersey that they have a right to have an employee of the title-insurance company attend the closing. Moreover, the title agent in that situation does not take over any of the functions performed by the buyer's attorney. Thus, title insurers in north Jersey do not customarily maintain escrow accounts for the purpose of disbursing funds at closings (although Commonwealth testified that it has an escrow account in north Jersey for the purpose of holding title escrows). The title agent would merely "mark up" the title binder and eliminate noted exceptions in the commitment when they are removed by the closing attorney. Only if mortgage-payoff funds were given to the agent would he or she forward them to the lending institution. The title insurer's charge for sending an agent to a north Jersey closing is $50 for the first ninety minutes and $25 an hour thereafter.

In addition, as mentioned, the closing attorneys in north Jersey must be approved by the title-insurance carrier. An approved attorney is defined by statute as

an attorney at law admitted to practice in the State of New Jersey, who is not an employee of a title insurance company or of a title insurance agent, upon whose examination of title and report thereon a title insurance company may issue a policy of title insurance.

[*N.J.S.A.* 17:46B–1(h).]

Courts that have considered the question of whether the purchaser's attorney at a real-estate closing, who supervises and effectuates the transfer of the title and secures title insurance, is an agent of a title-insurance company have reached different conclusions. In *Nappen v. Blanchard,* 210 *N.J.Super.* 655, 510 A.2d 324 (Law Div.1986), the court held that a buyer's attorney, also the title insurer's approved attorney, who stole closing funds intended to be used to pay off a preexisting mortgage, was neither an actual nor an apparent agent of the title-insurance company. In support of its conclusion, the court noted that an inherent conflict of interest would arise if the buyer's attorney were found to be an agent of both the title insurer and the buyer. It also determined that the reliance necessary for an apparent agency relationship did not exist.

However, in *Meyerson v. Lawyers Title Insurance Co.,* 39 A.D.2d 190, 333 *N.Y.S.2d* 33 (1972), the court found that an attorney who had prepared a false title report for mortgagees was an authorized agent of the title company and was acting within the scope of his authority when he submitted the report. The court was persuaded not only by the attorney's status as an "approved attorney," but also by the fact that the company had supplied the attorney with blank forms bearing the name of the company.

■ We do not find that the putative conflict of interest, which troubled the court in *Nappen,* precludes the existence of an agency relationship between the title insurer and the closing attorney. Dual representation and the possibility of conflicts of interest are not fatal to a finding that an agency relationship exists. Dual representation has been permitted in the insurance context. *E.g., Spilka v. South Am. Managers,* 54 *N.J.* 452, 255

A.2d 755 (1969); *see also* Appleman, 16 *Insurance Law and Practice* § 8736 (1981) ("It is not unusual for an insurance agency to represent both insurer and insured ..."). In almost all cases involving the completion of a real-estate-title closing, the interests of the title insurer are not in conflict with those of the purchaser. As was pointed out by the experts who testified at trial, nothing invidious infects a situation in which the attorney seeks to effectuate the interests of the buyer and the title insurer in completing real-estate closings. Indeed, in most title closings, a third-party lender is involved. Hence, in north Jersey the buyer's attorney often "wears three hats"—the attorney represents the interests of the buyer, the title-insurance company, and the buyer's lender, in effect, serving the interests of three principals. Thus, the possibility of a conflict of interest engenders a duty of full disclosure and disqualification if an actual conflict occurs. It does not, however, preclude the creation of an agency relationship between the attorney and the principals he or she serves.

█ The *Nappen* court also took the position that no reliance exists on the part of buyers with respect to the agency status of the buyer's attorney in acting on behalf of the title-insurance carrier. Reliance is usually essential to establish an agency relationship based on apparent authority. *E.g., N. Rothenberg & Son, supra,* 49 *N.J.Super.* at 382–83, 139 *A.*2d 783. However, it is not essential to an agency relationship predicated on actual authority, whether express, *e.g., Arcell, supra,* 152 *N.J.Super.* at 494–95, 378 *A.*2d 53, or implied, *e.g., Carlson, supra,* 6 *N.J.* at 212, 78 *A.*2d 83.

Nonetheless, Commonwealth stresses that buyers do not rely on title insurers to protect them against the losses caused by the approved attorney, in contrast to the protection afforded by title-insurance carriers to third-party lenders.

Reliance, however, to the extent it supports an agency relationship in this context, need not be predicated on the title insurer's express assurances that it will protect the buyer against losses occasioned by an attorney's misconduct. Reliance may be imput-

ed when the title insurer, in fact, does not deal with the attorney's client directly and, instead, conducts business through the attorney who is acting on its behalf as well as the client's. Thus, the purchaser, in effect, is without choice in the matter, and is required by the insurance company to rely on the attorney to perform the functions that serve the insurer.

Commonwealth points out that title-insurance carriers are statutorily permitted to send their insurance policies and all other papers to the attorney rather than to its prospective insured. *N.J.S.A.* 17:46B-9. However, that title-insurance carriers are authorized to deal directly with the buyer's attorney does not alter the status of the attorney as the agent of the title insurer with respect to the functions performed by the attorney for the insurer; nor does it alter the fact that the purchaser is compelled to rely on the attorney as the representative of the carrier.

Moreover, the practice by title insurers in interacting directly with attorneys is based not simply on statutory authority but rather on business judgment, convenience, and practicality. As the witnesses testified at trial, title-insurance companies solicit business almost exclusively through attorneys, who apply for insurance from companies with which they have developed an ongoing relationship.

The record also demonstrates sufficient indicia of Commonwealth's control over Gillen to support an agency relationship. All communication was between Commonwealth and Gillen. Commonwealth gave Gillen its blank forms to use. In the title commitment, Commonwealth directed Gillen to pay off and cancel the Sears mortgage. (Commonwealth originally stated in its answer to Kaiser's complaint: "Gillen was directed to payoff and cancel of record the existing Allstate mortgage." Commonwealth amended that answer one month before the trial.) It sent him the title-insurance policy and billed him directly for insurance premiums. Gillen remitted payment on behalf of his client.

In addition, the insurer's control over the closing attorney is implicit in the status of that attorney as an approved attorney of

the carrier. An approved attorney is one statutorily empowered to authorize the issuance of a title-insurance policy. *N.J.S.A.* 17:46B–1(h). Today an "approved attorney" is any attorney who has been retained by the purchaser to close the transaction and receive funds at the closing. However, at trial, experts testified that the practice in New Jersey at one time had been for approved attorneys to meet certain qualifications. Title-insurance companies bestowed the status of "approved attorney" only if they were satisfied with the attorney's skill and qualifications. The approved attorney was authorized to conduct title searches and "read" the search. Under instructions from the title insurer, the attorney would prepare a title report and the company would insure on the basis of the report.

Commonwealth stresses that the title-insurance company no longer follows that practice. It does not require an application in order for the attorney to be "approved"; nor does it perform an investigation of the attorney to check into his or her qualifications. Hence, Commonwealth contends, no special relationship now exists between it and the approved attorneys who apply for title insurance on behalf of purchasers. However, that argument serves to demonstrate not an absence of control over the approval of attorneys but only that such control is not fully exercised by insurers. That Commonwealth and other title-insurance carriers have become indifferent and lax in their actual control does not affect their right to control the closing attorney and hence does not derogate from the agency relationship based in part on control of the principal over the agent.

One further factor influences our consideration of whether the elements of authorization and control, as well as reliance, are present in this case to create an agency relationship. As the trial court noted, of all the innocent parties in this case, Commonwealth was in the best position to prevent the loss created by Gillen's theft. Without question Commonwealth was aware of that risk. *See* discussion, *infra* at 350 – 351, 634 *A.*2d at 85 – 86; see also *Clients' Security Fund, supra,* 134 *N.J.* at 369, 634 *A.*2d at 95

(involving real estate closing in which institutional lender is protected by title insurer against risk of closing attorney's misappropriation).

Other courts have considered awareness of the risk and the element of foreseeability of loss in their consideration of liability based on agency principles. In support of its determination that the title-insurance company should be held liable for an attorney's fraud on the basis of agency, the court in *Meyerson, supra,* 333 *N.Y.S.*2d at 37, stated that of two innocent parties, a loss caused by the fraud of a third party should fall on the one who enabled the fraud to be committed. In *Richards v. Attorneys' Title Guarantee Fund, Inc.,* 866 *F.*2d 1570 (10th Cir.1989), the court found the president of an escrow service to be the agent of a title-insurance company because the insurer had authorized the escrow service to perform the closing. The title-insurance company was liable for its agent's theft because it had placed him in a position to interact with the party who was harmed. *See also Hatton v. Quad Realty Corp.,* 100 *A.D.*2d 609, 473 *N.Y.S.*2d 827, 829 (1984) (holding that assignees of mortgagee had impliedly consented to an individual's agency for the purposes of collecting a homeowner's mortgage, tax, and other payments, and thus were responsible for his theft of these payments; also noting "as between two innocent parties the one who has allowed the fraud to be perpetrated should bear the loss"—the key is the foreseeability of the tortious conduct by the agent).

We conclude that Gillen was Commonwealth's agent for the purposes of its dealings with Kaiser in effectuating title insurance. Further, as evidenced by its practice in protecting institutional lenders, Commonwealth was aware of the risk of defalcation of closing funds by such attorneys. By dealing solely with attorneys rather than with their clients, it enabled the attorney to mislead or harm the purchaser. Commonwealth was in a position either to prevent or to protect against the loss suffered by Kaiser. Accordingly, we find that Commonwealth is liable for Gillen's theft.

## III

The trial court held that Commonwealth was liable to Kaiser primarily on the grounds that it had breached its duty of good faith, fair dealing, and full disclosure. The court reasoned that Commonwealth knew of the risk of attorney defalcation, as evidenced by the protection it offered institutional lenders against such a risk; thus, it had a duty either to give Kaiser an opportunity to insure himself against the risk or, at the very least, to inform him that he was not covered against such a risk.

Although title insurance is governed by statute in New Jersey, *see N.J.S.A.* 17:46B–1 to –62, title-insurance policies are considered contracts and, as such, are subject to common law principles of contract law and to the rules of construction applicable to other insurance policies. *See Sandler v. N.J. Realty Title Ins. Co.,* 36 *N.J.* 471, 478–79, 178 *A.*2d 1 (1962). Insurance policies, however, are not ordinary contracts. Rather, they are contracts of adhesion between parties who are not on an equal footing. *See Allen v. Metropolitan Life Ins. Co.,* 44 *N.J.* 294, 305, 208 *A.*2d 638 (1965). Therefore, title-insurance policies, like other policies of insurance, are liberally construed in favor of the insured and against the insurer. *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.,* 116 *N.J.* 517, 529, 562 *A.*2d 208 (1989).

The duty of good faith and fair dealing pervades insurance contracts. *See* Appleman, 12A *Insurance Law and Practice* § 7271, at 302 (1981). The prospective insured must not misrepresent or conceal information concerning risks entailed in coverage under an insurance policy. *See Massachusetts Mut. v. Manzo,* 122 *N.J.* 104, 584 *A.*2d 190 (1991); *Longobardi v. Chubb Ins. Co.,* 121 *N.J.* 530, 582 *A.*2d 1257 (1990). The insurance company, as the dominant party, however, has an even greater obligation than the insured to act in good faith. It must not put "technical encumbrances or hidden pitfalls" in the way of unsophisticated customers that would undermine their "reasonable expectations."

*Kievit v. Loyal Protect. Life Ins. Co.,* 34 *N.J.* 475, 482, 170 *A.*2d 22 (1961).

"When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations." *Id.,* at 482, 170 *A.*2d 22. In determining a policyholder's reasonable expectations, our courts have applied an objective standard of reasonableness. *See DiOrio v. New Jersey Mfrs. Ins. Co.,* 79 *N.J.* 257, 269, 398 *A.*2d 1274 (1979). "[O]rdinarily the company should be bound by the impression as to coverage which the average purchaser would gain from such inspection of the policy as he would be likely to make." *Caldwell· v. Aetna Casualty & Surety Co.,* 107 *N.J.Super.* 456, 461–62, 258 *A.*2d 900 (App.Div.1969).

 Normally, insurance purchasers are expected to read their policies and "the law may fairly impose upon [them] such restrictions, conditions and limitations as the average insured would ascertain from such reading." *Bauman v. Royal Indem. Co.,* 36 *N.J.* 12, 25, 174 *A.*2d 585 (1961). But despite the duty of insurance companies to supply insureds with a copy of their policy, *see* Thomas Fleming, *Insurer's Duty, and Effect of Its Failure, to Provide Insured or Payee with Copy of Policy or Other Adequate Documentation of Its Terms,* 78 *A.L.R.*4th 9, 17 (1990), under New Jersey law, title-insurance companies need not supply a copy of the title commitment to customers if their attorney applies for the policy. *N.J.S.A.* 17:46B–9. Thus, because Gillen applied for Kaiser's title commitment, Commonwealth was statutorily permitted to send a copy of the document to Gillen rather than to Kaiser.

 That Kaiser was not given the opportunity to examine the title-insurance policy or antecedent commitment does not mean that he would have had no reasonable expectations concerning his protection against risks surrounding the purchase of real estate for which he was acquiring title insurance. Even without reading the title commitment, Kaiser obviously had the impression that he was obtaining a clear title—one that would not be encumbered by a preexisting mortgage—and insurance that would cover clear

title. That expectation was bolstered in part by his payment of $704.25 to Commonwealth, the full premium for the insurance of a clear title. At trial he testified that when he handed Gillen the premium check, Gillen told him that he would be getting free title to Rose's condominium. That expectation was entirely consistent with what Commonwealth itself anticipated and believed would be covered by the policy based on that premium. That expectation was reasonable because even an unsophisticated consumer realizes that he is purchasing title insurance to protect against defects of title. *See Sandler, supra,* 36 *N.J.* at 478–79, 178 *A.*2d 1. Because we are governed by an objective standard, *see, e.g., DiOrio, supra,* 79 *N.J.* at 269, 398 *A.*2d 1274, one can readily infer that an average person in that situation would reasonably expect that his or her attorney, who was also acting on behalf of the title-insurance carrier, would remove all the encumbrances and that the title insurance would protect against any failure resulting in a loss because an encumbrance was not removed.

It is well established that insurance companies and brokers have a duty to advise insureds of their coverage needs where the insurer is aware of a particular peril. *E.g., Wasserman v. Wharton, Lyon & Lyon,* 223 *N.J.Super.* 394, 538 *A.*2d 1270 (App.Div. 1988); *Walker v. Atlantic Chrysler Plymouth,* 216 *N.J.Super.* 255, 523 *A.*2d 665 (App.Div.1987); *Sobotor v. Prudential Property & Casualty Ins. Co.,* 200 *N.J.Super.* 333, 339, 491 *A.*2d 737 (App.Div. 1984); *Rider v. Lynch,* 42 *N.J.* 465, 201 *A.*2d 561 (1964); *see* Gary Knapp, *Liability of Insurer or Agent of Insurer for Failure to Advise Insured as to Coverage Needs,* 88 *A.L.R.*4th 249, 257 (1990). Clearly, as earlier noted, *supra* at 346, 634 *A.*2d at 84, Commonwealth was acutely aware of the peril.

Title insurers differentiate between customers not only on the basis of their geographical location within the state, but also on the basis of whether they purchase real estate with their own moneys or, in part, with a purchase-money mortgage. When a buyer in north Jersey takes out a mortgage to help pay for real estate, the mortgagee is almost always an institutional lender.

(Only 1.5 percent of the Bergen County transactions for which Commonwealth issued a policy in recent years involved a purchase without a mortgage.) Title-insurance carriers specifically protect such institutional lenders against the risk of defalcation by the buyer's attorney handling the closing.

That protection is given through a "closing-protection letter" that insurers issue to the lender. The language of the standard closing-protection letter, including that used by Commonwealth, provides:

> When title insurance of Commonwealth Land Title Insurance Company is specified for your protection in connection with closings of real estate transactions in which you are to be the lender secured by a mortgage ... the Company ... hereby agrees to reimburse you for actual loss incurred by you in connection with such closing when conducted by our Approved Attorney [name of approved attorney is inserted here] and when such loss arises out of ... [f]raud or dishonesty by our Approved Attorney in handling your funds or documents in connection with such closing.

In the companion case, *Client Security Fund, supra,* 134 *N.J.* 358, 634 *A.*2d 90 the closing-protection letter was similar. *Id.* at 370 – 371, 634 *A.*2d at 95 – 96. One title-insurance carrier, Transamerica Title Insurance Company, also furnishes that protection to the purchaser. It adds the following clause to its closing-protection letter:

> If you are a lender protected under the foregoing paragraph, your borrower in connection with a loan secured by a mortgage on a one to four family dwelling shall be protected as if this letter were addressed to your borrower.

Thus, the question of whether we should impute to a purchaser like Kaiser the reasonable expectation that his title-insurance carrier would undertake, on the payment of a full premium, to protect against all risks that could affect clear title to the property, including the antecedent risk that moneys furnished to remove liens would be misappropriated by the closing attorney, is answered by the practices of the title-insurance industry.

Even if Commonwealth could not, or preferred not, to offer Kaiser protection against attorney theft of closing funds, its duty of good faith and fair dealing required, minimally, that it clearly disclose the fact that there was such an outstanding risk of loss for

which it was not offering coverage. In ruling that Commonwealth was under such a duty, the trial court relied on *Gerhardt v. Continental Insurance Co.*, 48 *N.J.* 291, 297, 225 *A.*2d 328 (1966), which held that purchasers of insurance are entitled "to the measure of protection necessary to fulfill their 'reasonable' expectations"; if an insurer chooses not to cover certain risks, it must communicate that choice conspicuously. Thus, at the very least, Commonwealth had a duty to inform Kaiser that there was a risk of attorney theft of closing funds, which might make his title unmarketable, and that he was not insured against such a risk. Obviously, to inform Kaiser of that omission of coverage, Commonwealth would have had to undertake some form of direct communication with him. However, the company's pragmatic business reasons for communicating only with attorneys cannot surmount its duty to its insured of good faith and fair dealing, including the obligation to disclose unprotected risks.

Commonwealth further contends that it would not have been able to insure against the risk of attorney defalcation for several reasons. It argues that such coverage would be in the nature of fidelity insurance and, as such, prohibited under the Title Insurance Act.

*N.J.S.A.* 17:46B–1(a) defines title insurance as:

insuring, guaranteeing or indemnifying owners of real property or others interested therein against loss or damage suffered by reason of liens, encumbrances upon, defects in or the unmarketability of the title to said property. . . .

Title-insurance companies regularly offer protection to institutional lenders against attorney theft of closing funds intended to pay off a preexisting mortgage, and as earlier noted, Transamerica offers such protection to borrowers as well. The protection against the risk of loss caused by attorney defalcation under the circumstances clearly is an incident to the issuance of title insurance. Commonwealth cannot now claim that such coverage is impermissible when the Commissioner of Insurance approved Transamerica's insurance coverage and, in fact, refused to allow the company to delete the coverage to borrowers because it would reduce the protection offered its clients. We observe, also, with-

out ruling on the matter, that to offer more comprehensive protection to lenders than to borrowers involved in the same transaction, when no difference exists in the degree of risk to the parties, and while charging the same premium regardless of whether the enhanced coverage is provided, may constitute rate discrimination, in violation of *N.J.S.A.* 17:46B–44. *N.J.S.A.* 17:46B–44(a) provides:

Every title insurance company that shall propose its own rates, and every title insurance rating organization shall propose rates that are not excessive nor inadequate for the safety and soundness of any title insurer, which do not unfairly discriminate between risks in this State which involve essentially the same exposure to loss and expense elements, and which shall give due consideration to the following matters: ...

We conclude that Commonwealth breached its duty of good faith and fair dealing in failing to apprise its insured, Kaiser, that there was an insurable risk of attorney defalcation and in failing expressly to provide or offer insurance coverage for that risk as an incident of the title insurance that it was committed to issue on the closing of title.

## IV

Our determination of liability raises several issues with respect to remedies. Those involve the status of the preexisting mortgage, counsel fees, and general corrective measures to reduce the risk of loss through attorney defalcations in real-estate closings.

## *A.*

■ In light of our determination that Commonwealth is liable for the defalcation of the closing attorney, Gillen, Commonwealth must assume responsibility for the failure to pay off and satisfy the existing mortgage of Sears. A consequence of that failure was that the Sears mortgage remained unsatisfied and in default, and Sears then became entitled to foreclose on its mortgage.

As the companion case, *Client Security Fund,* 134 *N.J.* at 371, 634 *A.2d* at 96, reveals, in a transaction involving an institutional lender that has a closing-protection letter from the title insurer,

the insurer becomes subrogated to the position of the lender on the payment for the loss. If a closing attorney steals funds that were to be used to satisfy a preexisting mortgage, the insurer seeks to purchase the preexisting mortgage by paying the amount due and taking an assignment of the mortgage. If the title company obtains an assignment, it subordinates the preexisting mortgage to the new one and provides first-mortgage status for the latter. However, it then forecloses on what has become a second mortgage. Commonwealth, in effect, would recoup its loss by moving against its own insured, the purchaser of the property, who paid for the title insurance. Sometimes, however, the holder of the preexisting mortgage will not agree to an assignment, perhaps out of concern for the loss that the buyer and/or seller would suffer if the title-insurance company forecloses on the property. In that case, Commonwealth would pay off the preexisting mortgage and would not recoup its loss. (Two cases in which prior mortgagees refused to assign a mortgage to Commonwealth involved other closing-fund thefts by Gillen.)

We are satisfied that because Commonwealth is responsible for the attorney's misappropriation, it must protect the purchaser against the loss. However, when the purchaser is paying for the property in full with his or her own funds, as in this case, there will be no new mortgage to which the existing mortgage can be subordinated. Hence, it is only fair that Commonwealth be required to pay off and cancel the existing mortgage. The trial court ordered Commonwealth to pay off the Sears mortgage and issue Kaiser an owner's title-insurance policy free of the Sears mortgage encumbrance. It also denied Sears a judgment of foreclosure and ordered Commonwealth to pay Rose's and Kaiser's attorney's fees. We agree with that disposition.

The trial court acted well within its discretion in fashioning an equitable remedy affecting four comparatively innocent parties. *See Stehr v. Sawyer*, 40 *N.J.* 352, 192 *A.*2d 569 (1963). Although Sears had a statutory right to foreclose on the Rose mortgage under *N.J.S.A.* 2A:50–2, the trial court instead ordered Common-

wealth to reimburse Sears for the full amount due on the mortgage so that Kaiser could remain in his home. To have done otherwise would have deprived Kaiser of the benefit of years of litigation. Furthermore, if Commonwealth had promptly satisfied its obligations under Kaiser's title insurance policy, the Sears mortgage would not have remained unsatisfied. Kaiser should not be punished for the uncertain state of the law at the time Gillen stole the Sears payoff funds. Although Sears had the statutory right to foreclose on the defaulted mortgage, that remedy is designed, ultimately, only to satisfy the monetary obligation that underlies the mortgage. *Eisen v. Kostakos,* 116 *N.J.Super.* 358, 365, 282 *A.*2d 421 (App.Div.1971). That objective will be accomplished by Commonwealth's satisfaction of the mortgage.

" 'Equitable remedies are distinguished for their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use.' " *Roach v. Margulies,* 42 *N.J.Super.* 243, 246, 126 *A.*2d 45 (App.Div.1956) (quoting *Sears Robuck & Co. v. Camp,* 124 *N.J.Eq.* 403, 411, 1 *A.*2d 425 (E. & A.1938)). We conclude that the trial court did not abuse its discretion in its balancing of the equities and its formulation of an appropriate remedy.

### *B.*

In addition, the trial court awarded counsel fees to Kaiser and Rose, and the Appellate Division reversed. Commonwealth challenges that award.

*Rule* 4:42–9(a)(6) provides that an award of counsel fees may be allowed "in an action upon a liability or indemnity policy of insurance, in favor of a successful claimant." The title-insurance policy at issue here is an "indemnity policy of insurance." *See Summonte v. First Am. Title Ins. Co.,* 180 *N.J.Super.* 605, 610, 436 *A.*2d 110 (Ch.Div.1981). The policy " 'is a contract of indemnity under which the insurer for a valuable consideration agreed to indemnify the insured in a specified amount against loss through defects of title to, or liens or encumbrances upon realty in

which the insured has an interest.' " *Walker Rogge, supra,* 116 *N.J.* at 528, 562 *A.2d* 208 (quoting *Sandler, supra,* 36 *N.J.* at 478–79, 178 *A.2d* 1). In this case, one ground of Commonwealth's liability is its failure to fulfill its implied duty of good faith, fair dealing, and full disclosure. As a result, Kaiser is entitled to the protection that adherence to that implied duty would have secured. Commonwealth was thus obligated to furnish the protection and coverage that may be imputed based on its implied obligations of good faith, fair dealing, and full disclosure. Hence, Kaiser's right to enforce those implied obligations and secure that protection is one derived from the title-insurance policy. We conclude, therefore, that Kaiser's action against Commonwealth is an action upon that indemnity policy.

The cases that deny an award of counsel fees under *Rule* 4:42–9(a)(6) in direct actions against an insurance carrier do not govern this case. Those direct-action cases typically involve an insured seeking to recover from his or her insurer for damage resulting from losses caused by theft, fire, the diminished value of property, and the like. *See, e.g., Walker Rogge v. Chelsea Title & Guar. Co.,* 222 *N.J.Super.* 363, 376, 536 *A.2d* 1309 (App.Div.1988), *aff'd in part, rev'd in part, and modified,* 116 *N.J.* 517, 562 *A.2d* 208 (1989) (ruling that negligence action based on defective search was not an action on the insurance policy). Here, Kaiser's claim is based not on direct loss, but rather on his liability to a third party, namely, Sears. Kaiser brought his action against Commonwealth to compel the insurer to pay off and discharge the Sears mortgage. The action is not a direct claim against the insurer, but a claim for indemnification under an insurance policy, and thus falls squarely within the provisions of *Rule* 4:42–9(a)(6).

 Rose, although not insured by Commonwealth, is also eligible for an award of counsel fees under *Rule* 4:42–9(a)(6). *See Tooker v. Hartford Accident & Indem. Co.,* 136 *N.J.Super.* 572, 347 *A.2d* 371 (App.Div.1975) (holding that driver and his insurance company qualified under rule when they were forced to sue car owner's insurer for indemnification). Hence, with our ruling

today, both Rose and Kaiser are successful claimants and thus qualify for an award of counsel fees under *Rule* 4:42–9(a)(6).

▪ The policy underlying *Rule* 4:42–9(a)(6) is "to discourage groundless disclaimers and to provide more equitably to an insured the benefits of the insurance contract without the necessity of obtaining a judicial determination that the insured, in fact, is entitled to such protection." *Guarantee Ins. v. Saltman,* 217 *N.J.Super.* 604, 610, 526 *A*.2d 731 (App.Div.1987). Although Commonwealth may not have been acting in bad faith when it refused to honor Kaiser's and Rose's demands, to deny Rose and Kaiser their counsel fees would be to deny them the benefits of the insurance contract that they achieved as successful litigants.

## *C.*

▪ We are also impelled to consider whether other corrective measures should be undertaken to avoid or reduce the risk of attorney defalcations committed in the course of real-estate-title closings and as an incident to the exercise of our authority to regulate the practice of law, *N.J. Const.* art. VI, § 2, ¶ 3. We have, in various contexts, enunciated rules to assure that persons participating in real-estate transactions will adhere to prescribed standards of conduct to effectuate and protect the interests of buyers and sellers. *See, e.g., Calvert v. K. Hovnanian at Galloway,* 128 *N.J.* 37, 607 *A*.2d 156 (1992); *New Jersey State Bar Ass'n. v. New Jersey Ass'n of Realtor Bds.,* 93 *N.J.* 470, 461 *A*.2d 1112, *modified,* 94 *N.J.* 449, 467 *A*.2d 577 (1983).

In this case, two concerns must be addressed. One relates to the fact that in north Jersey the closing attorney is approved by the title company and acts as its agent in disbursing closing money to remove exceptions to the title policy and in securing title insurance. In its communications, the title-insurance carrier must inform the attorney that he or she will be performing essential functions on behalf of the carrier and will be deemed to be the agent of the carrier, and further, that the carrier will prescribe the procedures for all disbursements. That requirement implicates

the problem of potential conflicts of interest and triggers the duty of full disclosure. Hence, the completion of those functions, including that communication, must also be sent to the purchaser. Further, the carrier may prescribe requirements for the approval and control of closing attorneys that will reduce the risks that irresponsible or unqualified attorneys will misappropriate, misuse, or mishandle closing funds. Finally, if the purchaser insists on retaining his or her own attorney, whether or not approved by the insurer, because the risk of attorney defalcation in these circumstances is an incident to the risks covered by title insurance, the title-insurance carrier shall advise the purchaser of that risk and indicate that it is a risk that is or may be covered by the title-insurance policy. We expect that title-insurance carriers will conform their practice to that which they regularly follow with respect to third-party lenders.

We are mindful that these directives are derived from our holdings in this case, that they are new, and that the matters they address are complex, controversial, and still relatively unsettled. We are fully aware that the rules that we now enunciate to govern real-estate closing practices in the future have significant implications relating not only to pragmatic concerns surrounding title closings and the title-insurance industry but also to standards of professional ethics that govern attorney conduct in these matters. Those concerns therefore clearly call for further and more extensive consideration. Accordingly, we direct that the Supreme Court's Committee on Civil Practice, with full authority to confer with expert and knowledgeable persons in the legal profession and the real-estate field, undertake to review and study these matters and provide the Court with its recommendations.

## V

We reverse the judgment of the Appellate Division and reinstate the judgment of the Law Division.

CLIFFORD, J., dissenting.

Subject to my comments in the companion case of *Clients' Security Fund v. Security Title & Guaranty Co.*, 134 *N.J.* 358, 634 *A.2d* 90, also decided this day, I would affirm substantially for the reasons set forth in the opinion of the Appellate Division, reported at 257 *N.J.Super.* 33, 607 *A.2d* 1327 (1992).

GARIBALDI, J., dissenting.

I would affirm, substantially for the reasons expressed in Judge Shebell's opinion for the Appellate Division, reported at 257 *N.J.Super.* 33, 607 *A.2d* 1327 (1992).

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices HANDLER, O'HERN, and STEIN—4.

*For affirmance*—Justices CLIFFORD and GARIBALDI—2.