975 A.2d 1016 (2009)
409 N.J. Super. 28
NEW JERSEY LAWYERS' FUND FOR CLIENT PROTECTION, Plaintiff-Appellant,
v.
STEWART TITLE GUARANTY CO., Defendant-Respondent, and
Atlantic Title Agency, Inc., and Richard Pizzi, Defendants.
DOCKET NO. A-2622-07T1.
Superior Court of New Jersey, Appellate Division.
Argued March 10, 2009.
Decided August 4, 2009.
*1017 Daniel R. Hendi, Deputy Director, argued the cause for appellant.
Jamiee Katz Sussner, argued the cause for respondent (Herrick Feinstein, attorneys, Newark; Ms. Sussner and Rachel C. Engelstein, on the brief).
Lomurro, Davison, Eastman & Munoz, Freehold, for amicus curiae New Jersey Land Title Association (Michael J. Fasano, on the brief).
Before Judges WINKELSTEIN, FUENTES and CHAMBERS.
The opinion of the court was delivered by
FUENTES, J.A.D.
In this appeal, we are required to determine whether a title insurance company is liable to its insureds for the defalcation of the closing attorney, because the carrier's written notice disclaiming any agency relationship between the attorney and the carrier was sent only to the attorney, and not to the insureds. Independent of the efficacy of the disclaimer notice, the trial court found that the title insurer could not be held liable because the attorney misappropriated his clients' funds before he had any contacts with the title insurance carrier.
We disagree with the trial court and reverse. We also reject the argument advanced by the carrier that a disclaimer notice, included here as part of the commitment packet sent to the closing attorney, can be imputed to the clients who are the victims of his theft.
We examine these legal issues in the following factual context.

I
On July 22, 2003, Stuart and Susan Goodman entered into a contract to purchase a new home in Somerset, New Jersey. They retained their neighbor, then attorney Richard Pizzi,[1] to represent them in the sale of their home and the purchase of a new property. On January 20, 2004, the Goodmans sold their home in Bedminster and received proceeds in the amount of $325,058.47. They instructed Pizzi to deposit $293,308.47 into his attorney trust *1018 account in anticipation of the closing on their new home.
On May 19, 2004, Pizzi sent a written request to Atlantic Title Insurance Agency, Inc. (Atlantic Title), an agent of Stewart Title Guaranty Company (Stewart Title), to provide title insurance for the Goodmans. The letter from Pizzi to Atlantic Title stated, in pertinent part: "THIS IS A CASH DEAL ... THIS IS A SUPER RUSH! THEY WOULD LIKE TO CLOSE ON MONDAY MAY 24, 2004."
The following day, May 20, 2004, the Goodmans deposited an additional $20,000 with Pizzi, believing these funds were necessary to close title on the property they were buying.[2] By letter dated May 25, 2004, William McLaughlin, the president and founder of Atlantic Title, sent Pizzi a "Commitment for Title Insurance," listing Pizzi as the applicant, and the Goodmans as the purchasers. The transmittal letter reflected a four-point check list of documents Pizzi was entrusted to deliver to the title insurer after the closing of title.
a) Seller(s) and/or Mortgagor(s) Affidavit of Title, as applicable;
b) Your check in payment of our Final Invoice;
c) Complete Attorney(s) Closing Report Form;
d) Any other document required by our Commitment.
Conspicuously missing from this list is any reference to the disclaimer notice intended to apprise the insureds that the title insurer was not accepting any responsibility for the misconduct of the attorney. That document, denoted by Stewart Title as IMPORTANT NOTICE OF DISCLOSURE, was not addressed to anyone in particular; it was merely included among the multitude of papers comprising the Commitment for Title Insurance packet. It reads, in relevant part, as follows:
THE ATTORNEY RETAINED BY YOU, OR BY YOUR LENDER, CLOSING OR SETTLING THIS TITLE IS NOT AN AGENT FOR AND DOES NOT ACT ON BEHALF OF FIRST AMERICAN TITLE INSURANCE COMPANY[3] [sic]. THE COMPANY ASSUMES NO LIABILITY FOR ANY LOSS, COST OR EXPENSE INCURRED BY YOU BECAUSE YOUR ATTORNEY OR YOUR LENDER'S ATTORNEY HAS MADE A MISTAKE OR MISAPPLIED YOUR FUNDS. Because the attorney is not our agent, we assume no responsibility for any information, advise [sic] or title insurance promise the attorney may give or make. Our only liability to you is under the terms of the Commitment, Policy and Closing Service Letter if you choose to obtain one.
According to McLaughlin's deposition testimony, this document was intended to put the Goodmans on notice of the coverage limitations and exclusions concerning Pizzi's conduct. McLaughlin conceded, however, that at no time prior to the closing had any representative from Stewart Title directly contacted or otherwise directly notified the Goodmans of any coverage exceptions under the title policy. At all times relevant here, Atlantic Title, as agent for Stewart Title, did not attend closings or directly communicate with its insureds. As a matter of business practice, Atlantic Title relied exclusively on the buyers' attorney to perform the legal tasks necessary to close title.
*1019 The closing for the Goodmans' new home took place on June 1, 2004, just five days after Atlantic Title issued its Commitment Letter. The checks Pizzi issued from his attorney trust account to cover the closing expenses were returned for insufficient funds. It is not disputed that, between January 20, 2004, and May 20, 2004, Pizzi stole at least $277,717 of the money the Goodmans had deposited with him. As a result, Pizzi failed to satisfy any of the obligations reflected in the closing statements, including paying the seller's outstanding mortgage with the Bank of New York. The Goodmans were thus forced to borrow the funds necessary to pay off the Bank of New York mortgage.
Stewart Title denied the Goodmans' claim for coverage under the title policy. Thereafter, the New Jersey Lawyers' Fund for Client Protection (the Fund), paid the Goodmans an initial award of $277,717, and a supplemental award of $29,739.47, for a total of $307,456.47. Pursuant to Rule 1:28-3(e), the Goodmans signed a subrogation agreement assigning to the Fund their rights to recover the compensation paid from any collateral source. Thereafter, Stewart Title paid the Fund $20,000 without prejudice or admission of liability.

II
Against these facts, the title insurance carrier argues that the disclaimer included as part of the title insurance commitment binder effectively shielded the carrier from liability, because the attorney who received it was the agent of the insureds. Accordingly, service on the attorney was sufficient to put the insureds on constructive notice that the carrier was not assuming responsibility for the attorney's malfeasance. We disagree.
The salient facts described are not disputed. The legal issues presented are thus ripe for disposition as a matter of law. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); R. 4:46-2. Both sides also agree that resolution of the issues presented depend upon an application of the principles the Court laid out in Sears Mortgage Corp. v. Rose, 134 N.J. 326, 634 A.2d 74 (1993).
In Sears, the Court held that in order to nullify the agency relationship created when the title insurance company designates and empowers the closing attorney to deliver clear title to the insureds, the title company must notify the insureds directly that the title insurance policy will not cover any losses resulting from the attorney's misconduct. Id. at 357, 634 A.2d 74. Here, the title insurer's disclaimer notice failed to sever this agency relationship because the notice was sent only to the attorney. Stated in more generic terms, a disclaimer by a principal intended to put a third party on notice that the principal does not assume liability for the malfeasance of its agent, must be sent directly to the third party. This is so because, as the Court noted in Sears, there is an inherent conflict of interest between the agent/attorney and the principal/title insurer. Ibid.
The facts in Sears are remarkably similar to the facts we confront here. The seller retained an attorney to represent him in the sale of his condominium. Sears, supra, 134 N.J. at 333, 634 A.2d 74. The buyer intended to pay the purchase price "cash," that is, without financing. Ibid. To accomplish this, the buyer needed first to sell his home, and then use the proceeds of that sale to buy the condominium. Ibid. The buyer retained an attorney to represent him in both the sale of his home and the purchase of the condominium. Ibid.
The buyer's attorney contracted with Commonwealth Land Title Insurance *1020 Company (Commonwealth) to issue the title insurance policy. Ibid. As was the case here with Atlantic Title, Commonwealth issued a commitment listing the attorney as "applicant" and the buyer as the "proposed insured." Ibid. The commitment also purported to limit the insured's liability under the policy by noting:
"[t]he Policy will insure you against certain risks to the land title, subject to the limitations shown in the Policy." The cover sheet also stated in bold capital letters: "You should read the commitment very carefully.... If you have any questions about the Commitment, contact the local office issuing this commitment."
[Id. at 333-34, 634 A.2d 74.]
On the day of closing, the buyer endorsed and delivered to his attorney a check in the amount of $127,000, representing the net proceeds from the sale of his home, and paid him an additional $38,000 to cover the cost of purchasing the condominium. Id. at 334, 634 A.2d 74. The attorney absconded with these funds; the checks written from his trust account were returned for insufficient funds, including the check written to pay off the condominium seller's underlying mortgage with Sears. Id. at 335, 634 A.2d 74. The attorney was subsequently criminally prosecuted and disbarred. Ibid.
In contrast to the facts here, the Fund in Sears denied compensation to the client/victim, arguing that he had a collateral source of recovery from the title insurance carrier, Commonwealth. Id. at 336, 634 A.2d 74. The issue came before the trial court on the client's action against Commonwealth. Ibid. The trial court found the title insurer liable. Ibid. On direct appeal, we reversed the trial court's ruling. Ibid. After granting certification, the Supreme Court reversed us, holding the title insurer liable. Id. at 357, 634 A.2d 74.
After extensively reviewing our State's geographically centered title closing practices, (the so-called south Jersey and north Jersey practices), the Sears Court noted that "this case illustrates the north Jersey practice." Id. at 340, 634 A.2d 74. Against these facts, the Court concluded that the attorney was the agent of the title insurance carrier for the purposes of the carrier's dealing with the client/insured. Id. at 346, 634 A.2d 74. In reaching this conclusion, the Court noted that
[b]y dealing solely with attorneys rather than with their clients, [the carrier] enabled the attorney to mislead or harm the purchaser. Commonwealth was in a position either to prevent or to protect against the loss suffered by [its insured]. Accordingly, we find that Commonwealth is liable for [the attorney's] theft. [Ibid.]
The Court also found Commonwealth liable for violating the title insurance policy's implied covenant of good faith and fair dealing. Id. at 348-52, 634 A.2d 74.
The Sears Court was also acutely aware of the inherent conflict of interest created by imposing liability on title insurance carriers for the misconduct of the closing attorney. As the following passage illustrates, the only way to resolve such conflict is to adhere strictly to a policy of full disclosure.
[I]n north Jersey the closing attorney is approved by the title company and acts as its agent in disbursing closing money to remove exceptions to the title policy and in securing title insurance. In its communications, the title-insurance carrier must inform the attorney that he or she will be performing essential functions on behalf of the carrier and will be deemed to be the agent of the carrier, and further, that the carrier will *1021 prescribe the procedures for all disbursements.
That requirement implicates the problem of potential conflicts of interest and triggers the duty of full disclosure. (Emphasis added.)
[Id. at 356-57, 634 A.2d 74.]
This "duty of full disclosure" requires the title insurance carrier and its agent (the closing attorney) to take affirmative steps to inform the client/insured directly of the status of the transaction. Through its closing instructions, the title insurance carrier controls the attorney's closing-related functions, and is therefore in the best position to insure that the client is kept fully informed on the status of the file. As the Court noted:
Hence, the completion of those [closing preparation] functions, including that communication, must also be sent to the purchaser. Further, the carrier may prescribe requirements for the approval and control of closing attorneys that will reduce the risks that irresponsible or unqualified attorneys will misappropriate, misuse, or mishandle closing funds.
[Id. at 357, 634 A.2d 74.]
Thus under Sears, defalcation committed by the buyer's attorney remains a risk covered under the title insurance policy, unless the title insurance carrier notifies its insured directly that the policy does not cover such risk.
Finally, if the purchaser insists on retaining his or her own attorney, whether or not approved by the insurer, because the risk of attorney defalcation in these circumstances is an incident to the risks covered by title insurance, the title-insurance carrier shall advise the purchaser of that risk and indicate that it is a risk that is or may be covered by the title-insurance policy. We expect that title-insurance carriers will conform their practice to that which they regularly follow with respect to third-party lenders.
[Id. at 357, 634 A.2d 74.]
Here, the record shows that Atlantic Title failed to take the steps necessary to inform the Goodmans directly that the title policy they were buying did not cover the risk of Pizzi's defalcation. Atlantic Title's practice to include the disclaimer statement (its so-called CSL) in an insurance commitment binder that is sent only to the buyer's attorney, does not sever, as a matter of law, the agency relationship between the carrier and the attorney. By requiring that the disclaimer notice be sent directly to the client/insured, the Sears Court implicitly recognized the improbability that a potentially wayward attorney would faithfully notify his or her clients that their title insurance policy does not protect them against the theft of their closing funds by the attorney.
Both Stewart Title and Amicus Curiae, New Jersey Land Title Association (NJLTA), assert that after the Court's decision in Sears, the title insurance industry successfully lobbied the Commissioner of the Department of Banking and Insurance (DOBI) to approve two forms that: (1) negate the agency status upon which Sears is predicated; and (2) provide a type of optional coverage for situations involving attorney misappropriation. These forms are: "Important Notice and Disclosure" (IN & D); and "Closing Service Letter" (CSL). Stewart Title and NJLTA have not presented any evidence, however, that, in approving these forms, the Commissioner addressed the central question under review here: whether inclusion of these notices in a title commitment packet that is sent only to the closing attorney is sufficient to place the insured on notice of the content of these disclaimers. In our *1022 view, the Sears Court answered that question in the negative.
Thus, consistent with the Court's holding in Sears, we conclude that, in the context of a real estate closing conducted under the so-called north Jersey method, in order to sever the inherent agency relationship between the title insurance carrier and the closing attorney, the carrier must serve the notice of disclaimer directly on the client/insured. The preferred and most effective method of service should include a signed verification from the client/insured acknowledging receipt of the notice. Here, Atlantic Title's practice of including such disclaimer as part of the insurance commitment packet, that is sent only to the buyer's attorney, failed to sever that agency relationship.

III
On the question of the timing of the theft, the trial court found dispositive that Pizzi misappropriated the funds entrusted to him before he had any contacts with Atlantic Title. Stated differently, the trial court found that a principal could not be held vicariously liable for the malfeasance committed by its agent before the agency relationship existed. According to the trial court, to impose vicarious liability to the carrier under these circumstances was "inequitable and unfair and inappropriate in law."
This conclusion misapprehends the unique interplay between attorneys and real estate carriers in a real estate closing conducted under the north Jersey practice. The following description of north Jersey closing practices illustrates the point:
[I]n north Jersey, title-insurance carriers do not use their own employees or `title agents' to supervise real-estate-title closings. They rely, instead, on the attorney for the purchaser, whom they must approve, to perform the functions of the title agent. The buyer's attorney in north Jersey acts as the representative of, and performs the functions for, the title insurer in the same way as does the title agent in south Jersey. All communication with title-insurance companies with respect to the purchaser are directed to the purchaser's attorney. The buyer's attorney will accept the deed and necessary title and closing documents from the seller. He or she will remove all exceptions to the title according to the title commitment. The buyer's attorney disburses all moneys; he or she will withhold a portion of the purchase price to satisfy outstanding liens and, with respect to any existing mortgage, obtain the mortgage-payoff statement, transmit the appropriate funds to the mortgagee, and receive the cancelled mortgage for recording. The attorney will authorize the issuance of title insurance.
[Sears, supra, 134 N.J. at 340, 634 A.2d 74.]
By bestowing upon the buyer's attorney the authority and responsibility to oversee each detail of the transaction, the title carrier is in the best position to prevent the harm of defalcation, not just at the moment when the theft occurred, but at any time during the various key procedural events leading to the closing of title, and beyond. Imposing liability on the title insurance carrier under these circumstances is predicated on the fact that, as a matter of business practice, the carrier
in fact, does not deal with the attorney's client directly and, instead, conducts business through the attorney who is acting on its behalf as well as the client's. Thus, the purchaser, in effect, is without choice in the matter, and is required by the insurance company to rely on the attorney to perform the functions that serve the insurer.

*1023 [Id. at 344, 634 A.2d 74.]
We thus hold that Stewart Title, and its agent Atlantic Title, are vicariously liable for Pizzi's defalcation that began before the creation of an agency relationship, but continued, unabated, after the agency relationship was clearly established. The harm caused by the attorney to his clients cannot be isolated to any discrete act. In this context, the title insurer is liable because the chain of defalcation continued long after the agency relationship was created.
As this case illustrates, the attorney's theft of his clients' funds set in motion a chain of fraudulent conduct that continued until the theft was discovered. This pattern of misconduct began when the attorney misappropriated his clients' money for his personal use; continued through all of the interim steps necessary to close title; and finally came to light when the checks he issued from his attorney trust account to cover the various costs of the sale, including payment to the seller, were returned for insufficient funds.

IV
Finally, the Fund has requested, in the event we reversed the trial court, that we award it counsel fees under Rule 4:42-9(a)(6), for having had to prosecute this action. Although we agree that the Fund is entitled to an award of counsel fees, Sears, supra, 134 N.J. at 356, 634 A.2d 74, we remand for the trial court to determine the amount of the award. R. 2:11-4(a).
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] The Supreme Court disbarred Pizzi by consent on June 23, 2004. In re Pizzi, 180 N.J. 260, 850 A.2d 493 (2004).
[2] This was obviously not the case. In fact, the original $293,308 that Pizzi received from the sale of the Goodman's home was sufficient to satisfy all closing obligations.
[3] This reference to "First American Title Insurance Company" is an error.