1 A.3d 632

NEW JERSEY LAWYERS' FUND FOR CLIENT PROTECTION, PLAINTIFF–RESPONDENT, v. STEWART TITLE GUARANTY CO., DEFENDANT–APPELLANT, AND ATLANTIC TITLE AGENCY, INC., AND RICHARD PIZZI, DEFENDANTS.

Argued March 8, 2010—Decided August 2, 2010.

*Jaimee Katz Sussner* argued the cause for appellant (*Herrick, Feinstein,* attorneys; *Ms. Sussner* and *Rachel C. Engelstein,* on the briefs).

*Daniel R. Hendi,* Deputy Director, argued the cause for respondent (*Kenneth J. Bossong,* Director and Counsel, New Jersey Lawyers' Fund for Client Protection, attorney; *Mr. Hendi* and *Mr. Bossong,* on the letter briefs).

*Elliot D. Ostrove* argued the cause for amicus curiae New Jersey State Bar Association (*Allen A. Etish,* President and *Day Pitney,* attorneys; *Richard H. Steen,* President–Elect, of counsel; *Mr. Ostrove, Lawrence J. Fineberg* and *Donald A. Soutar,* on the brief).

*Mark R. Cuker* submitted a brief on behalf of amicus curiae National Association of Consumer Advocates (*Williams Cuker Berezofsky,* attorneys; *Mr. Cuker* and *Alan H. Sklarsky,* on the brief).

*Michael J. Fasano* submitted a brief on behalf of amici curiae American Land Title Association and New Jersey Land Title Association (*Lomurro, Davison, Eastman & Munoz,* attorneys).

Justice WALLACE, JR., delivered the opinion of the Court.

In this case, we must determine whether the title insurance company in a real estate transaction is responsible for an attorney's theft of his clients' funds from the attorney's trust account. After the unauthorized removal of the clients' funds, the attorney ordered title insurance and the real estate closing took place. The checks written from the attorney's trust account to cover the costs related to the closing were dishonored. The title company refused to honor the clients' claim, and the clients were forced to pay the deficiency. Subsequently, the Lawyers' Fund for Client Protection (Lawyers' Fund) reimbursed the clients and received an assignment of the clients' claim. The Lawyers' Fund filed suit against several defendants, including the title insurance company.

The trial court granted the title company's motion for summary judgment, concluding that the undisputed facts demonstrated that the attorney had misappropriated the money before the title company became involved in the transaction. On appeal, the Appellate Division, relying on this Court's opinion in *Sears Mortgage Corp. v. Rose*, 134 *N.J.* 326, 634 *A.*2d 74 (1993), reversed. We granted Stewart Title Guaranty Company's petition for certification. We now reverse and reinstate the trial court's judgment.

I.

In January 2004, Stuart and Susan Goodman (the Goodmans) sold their Bedminster, New Jersey residence and received approximately $325,000 in net proceeds. Richard Pizzi, a local attorney, who had previously represented the Goodmans in other real estate transactions, represented them at the real estate closing. The Goodmans intended to use the proceeds generated from the closing to purchase another home on Bayard Road in Somerset, New Jersey. Rather than receive all the proceeds from the sale of their Bedminster residence, the Goodmans instructed Pizzi to disburse $50,000 to them and to retain the balance in his attorney trust account until the closing took place on the Somerset residence. Unknown to the Goodmans, and without their authorization to act on their behalf in such a manner, Pizzi permanently removed almost all, if not all of the Goodmans' money for his personal use.

On May 19, 2004, Pizzi contacted Atlantic Title Agency, Inc., agent for Stewart Title Guaranty Company, and ordered title insurance for the Somerset property. Pizzi instructed Atlantic Title that it was a cash deal, and his clients wanted to close on Monday, May 24, 2004. On the same date, the Goodmans wired Pizzi an additional sum of $20,000 because they believed it was necessary to satisfy their obligations at closing.

On May 25, 2004, Atlantic Title mailed to Pizzi a Commitment for Title Insurance for the Goodmans' new home. The cover letter instructed Pizzi that after the closing occurred, he must

provide Atlantic Title with an Affidavit of Title, a check in the amount of Atlantic Title's Final Invoice, the Completed Attorney Closing Report Form, and any other documents required by the Commitment.

The terms of the Commitment provided that the policy was subject to various conditions and included a notice and disclosure that was partially in bold letters. The relevant section was addressed to the purchasers as follows:

2. THE ATTORNEY RETAINED BY YOU, OR BY YOUR LENDER, CLOSING OR SETTLING THIS TITLE IS *NOT* AN AGENT FOR AND DOES NOT ACT ON BEHALF OF FIRST AMERICAN TITLE INSURANCE COMPANY. THE COMPANY ASSUMES NO LIABILITY FOR ANY LOSS, COST OR EXPENSE INCURRED BY YOU BECAUSE YOUR ATTORNEY OR YOUR LENDER'S ATTORNEY HAS MADE A MISTAKE OR MISAPPLIED YOUR FUNDS. Because the attorney is not our agent, we assume no responsibility for any information, advi[c]e, or title insurance promise the attorney may give or make. Our *only* liability to you is under the terms of the Commitment, Policy and Closing Service Letter if you choose to obtain one.

[Emphasis in original.]

It was the practice of Atlantic Title to send the notice and disclosure to the buyer's attorney in anticipation that the attorney would share the information with the client. At all times through the date of closing on June 1, 2004, Atlantic Title dealt directly with Pizzi and had no contact with the Goodmans.

On June 1, 2004, the Goodmans attended the closing for the Somerset property. Pizzi, the closing attorney, issued a number of checks from his trust account to complete the transaction. No representative from either Atlantic or Stewart Title attended the closing. Soon thereafter, the Seller's attorney called the Goodmans to inform them that the check Pizzi sent from their closing funds to pay off the Seller's mortgage was returned for insufficient funds. Eventually, the Goodmans learned that Pizzi had embezzled their money.[1] As a result, they arranged a new loan to replace the funds previously given to Pizzi for the closing.

---

[1] Pizzi was disbarred by consent because of his misconduct in this case. *In re Pizzi*, 180 *N.J.* 260, 850 *A.2d* 493 (2004).

After the Goodmans' claim for coverage was denied by Stewart Title, they sought recovery from the Lawyers' Fund.[2] In the fall of 2004, the Lawyers' Fund initially awarded the Goodmans $277,717, and then supplemented it with an additional $29,739, for a total award of $307,456. As part of the reimbursement process, the Goodmans assigned to the Lawyers' Fund their "rights, claims and interests against Richard A. Pizzi, or any other party involved in the transaction giving rise to this claim up to the amount actually paid hereunder."

The Lawyers' Fund then sought payment from Stewart Title, but was not successful. Stewart Title did agree, however, to pay $20,000 to the Lawyers' Fund without prejudice or admission of liability.

Thereafter, the Lawyers' Fund filed a complaint against Atlantic Title, Stewart Title,[3] and Richard Pizzi demanding $277,177 plus interest.[4] The Title Company filed its answer and following discovery, the Lawyers' Fund moved for summary judgment, while the Title Company cross-moved for summary judgment. The trial court granted judgment in favor of the Title Company, finding that it was not disputed that the agency relationship between Pizzi and the Title Company was created after Pizzi took the Goodmans' money. Consequently, the trial court concluded that it would be unfair to hold the Title Company responsible for Pizzi's misconduct because it had no control over Pizzi's actions at the time he misappropriated the money.

---

[2] The Lawyers' Fund was established to reimburse clients "to the extent and in the manner provided by [Our] rules, of losses caused by the dishonest conduct of members of the bar of this State." R. 1:28–1(a).

[3] Hereafter, we refer to the title companies together in the singular as the Title Company.

[4] Although the Lawyers' Fund paid the Goodmans a total amount of $307,456, and after receipt of $20,000 from the Title Company there was a potential claim for $287,717, the complaint sought only $277,717 plus interest.

The Lawyers' Fund appealed. In a published opinion, the Appellate Division reversed. *N.J. Lawyers' Fund for Client Prot. v. Stewart Title Guar. Co.*, 409 *N.J.Super.* 28, 30, 975 *A.*2d 1016 (2009). The panel reviewed this Court's opinion in *Sears* and held that because the Title Company's notice of disclaimer form was not sent directly to the Goodmans, the agency relationship between the Title Company and attorney continued. *Id.* at 33–37, 975 *A.*2d 1016. The panel declared that a Title Company "is in the best position to prevent the harm of defalcation, not just at the moment when the theft occurred, but at any time during the various key procedural events leading to the closing of title and beyond." *Id.* at 38, 975 *A.*2d 1016. The panel concluded that, although Pizzi's defalcation began prior to the creation of an agency relationship between him and the title insurers, it "continued, unabated, after the agency relationship was clearly established[,]" making the Title Company responsible. *Id.* at 39, 975 *A.*2d 1016.

We granted Stewart Title's petition for certification. 200 *N.J.* 502, 983 *A.*2d 1110 (2009). We also granted amicus curiae status to National Association of Consumer Advocates (Consumer Advocates), New Jersey State Bar Association (Bar Association), New Jersey Land Title Association, and the American Land Title Association (together, Title Association).

## II.

Defendant Title Company argues that the Appellate Division's decision below contradicts doctrines of both agency and vicarious liability and fails to recognize that Pizzi was the agent of the Goodmans at the time of the theft. It believes that the forms, which were approved by the Department of Banking and Insurance, superseded this Court's decision in *Sears,* and that Pizzi's knowledge of the disclaimer forms is imputed to the Goodmans. The Title Company further contends that no insurance policy was ever issued to the Goodmans, but if the Commitment is deemed a

contract, then the contract also includes the disclaimer for theft by the attorney.

Plaintiff Lawyers' Fund counters that the decision in *Sears* is controlling and that the Title Company failed to provide direct notice to the Goodmans of its disclaimer. As a result, the Lawyers' Fund contends that the Title Company did not fulfill its implied duty of good faith, fair dealing, and full disclosure.

Amicus Consumer Advocates urges this Court to affirm for the reasons expressed by the Appellate Division. Consumer Advocates argues that the Title Company is liable for an attorney's theft after the creation of an agency relationship based on the insurer's grant of "approved attorney" status. Further, it asserts that the Department of Banking and Insurance lacks the authority to override the law recognized in *Sears*.

Amicus Title Association argues that the Appellate Division decision is inconsistent with *Sears* and principles of agency law. The Title Association notes that Pizzi was not the agent of the Title Company at the time of the theft, and therefore the Title Company was not in a position to prevent the theft. It adds that after *Sears*, the Commissioner of Banking and Insurance modified the law to negate the "agency" status under *Sears* and to provide a type of optional coverage for attorney misapplication of funds at closings. The Title Association points to *N.J.S.A.* 17:46B-9, which authorizes title insurers to mail notices or forms to the proposed insured's attorney, and contends that even if the failure to give actual notice to the insured is relevant, such notice does not change the fact that no theft occurred within the scope of the agency relationship discussed in *Sears*.

Amicus Bar Association contends that the Appellate Division's decision extends *Sears* beyond its holding and is detrimental to the attorney-client relationship. The Bar Association argues that this Court should reconsider the principles of *Sears* because of its harmful impact on practicing attorneys in real estate transactions.

III.

A.

The Title Insurance Act of 1974, *N.J.S.A.* 17:46B–1 to –62, provides a comprehensive scheme regulating the business of title insurance. *L.* 1975, *c.* 106, § 1. The Act authorizes title insurance companies to insure title to real estate, *N.J.S.A.* 17:46B–10, and requires that "all forms of title policies and other contracts of title insurance" be filed with the Commissioner of Insurance before a policy may be issued. *N.J.S.A.* 17:46B–54. The Commissioner is charged with the responsibility of enforcement of the Act and has authority to examine the affairs of title insurance companies. *N.J.S.A.* 17:46B–40, –51, –58. In fact, the Act directs the Commissioner to "make an examination into the affairs of every authorized domestic title insurance company at least once in every [three] years[.]" *N.J.S.A.* 17:46B–58(b).

"A title insurance policy is a contract that protects a landowner against loss caused by defective title to the land." *Shotmeyer v. N.J. Realty Title Ins. Co.*, 195 *N.J.* 72, 82, 948 *A.2d* 600 (2008) (internal citation omitted). Similar to other forms of insurance, a title insurance policy should be "liberally construed in favor of the insured and strictly construed against the insurer." *Ibid.* (citation and internal quotation marks omitted). If the policy is clear, it should be enforced as written. *Ibid.* If the policy is ambiguous, courts generally "interpret the contract in accordance with the 'reasonable expectations' of the insured." *Ibid.* (citations omitted). In any event, a court must not rewrite the policy in favor of the insured, "under the guise of interpreting a contract's reasonable terms." *Id.* at 82–83, 948 *A.2d* 600.

B.

The parties in this appeal, as well as the Appellate Division in its opinion, relied upon our decision in *Sears.* The Title Company, the Title Association, and the Bar Association all argue that *Sears* does not control the disposition of this appeal, while the Lawyers'

Fund and Consumer Advocates urge that the Appellate Division appropriately applied *Sears* in reaching its decision in favor of the Lawyers' Fund.

We turn now to examine *Sears, supra,* in which, in the background of a real estate closing, this Court reviewed the relationships among a client, the closing attorney, and the title insurance company to determine which party should ultimately bear the loss caused by the closing attorney's theft of monies designated to satisfy existing obligations on the property. 134 *N.J.* at 332, 634 *A.*2d 74. The facts reveal that the purchaser of a condominium retained an attorney to represent him at a closing. *Id.* at 333, 634 *A.*2d 74. The attorney contacted a title insurance company that he had previously utilized and procured a commitment for his client, the purchaser. *Ibid.* At closing, the purchaser paid the necessary funds, but instead of satisfying the mortgage on the premises, the attorney misappropriated the purchaser's funds. *Id.* at 334–35, 634 *A.*2d 74. The title insurance company refused to issue a title policy that was free of the mortgage and the purchaser unsuccessfully sought reimbursement from the Lawyers' Fund. *Id.* at 335, 634 *A.*2d 74. The lien holder eventually filed a mortgage foreclosure action, and the purchaser filed a third-party complaint against the title insurance company. *Id.* at 336, 634 *A.*2d 74. The trial court found that the title insurance company was liable to pay off the mortgage, but the Appellate Division reversed. *Id.* at 336–37, 634 *A.*2d 74.

Our Court began its analysis by iterating principles of agency, *id.* at 337–38, 634 *A.*2d 74, explaining that "[c]ritical to the question of agency in this case are the specific role and functions undertaken by the closing attorney and the extent to which those activities were authorized and directed by the title-insurance company and served its specific purposes in the title closing[,]" *id.* at 338, 634 *A.*2d 74.

We also recognized the distinction between south Jersey and north Jersey closings. *Id.* at 339–41, 634 *A.*2d 74. It observed that in south Jersey closings, a representative from the title

company attends and presides over the closing and disburses all funds to complete the closing, but that in north Jersey closings, the attorney for the buyer performs the functions of the title representative. *Ibid.* We ultimately concluded that the purchaser "is required by the insurance company to rely on the attorney to perform the functions that serve the insurer[,]" *id.* at 344, 634 *A.*2d 74, and that this forced reliance supported the finding of an agency relationship, *id.* at 343–44, 634 *A.*2d 74.

We specifically rejected the title company's argument that it was permitted by *N.J.S.A.* 17:46B–9 to communicate directly with the purchaser's attorney. *Id.* at 344, 634 *A.*2d 74. We found that despite the statutory authorization, the statute "does not alter the status of the attorney as the agent of the title insurer with respect to the functions performed by the attorney for the insurer;" and in addition, does not "alter the fact that the [buyer] is compelled to rely on the attorney as the representative of the carrier." *Ibid.* Moreover, because the title company had exercised sufficient "control over the attorney to support an agency relationship[,]" *ibid.*, we reasoned that the title company "was in the best position to prevent the loss created by [the attorney]'s theft[,]" *id.* at 345, 634 *A.*2d 74. We explained that "[b]y dealing solely with attorneys rather than with their clients, [the title insurance company] enabled the attorney to mislead or harm the [buyer]." *Id.* at 346, 634 *A.*2d 74. We ultimately determined that a closing attorney designated as the "approved attorney" by the title insurer served in a dual capacity as an agent for both the purchaser and the title insurance company, and therefore the responsibility for the attorney's theft of the money deposited at closing should be placed on the insurer, which exercised greater control over the attorney and was in a better position to avoid the loss. *Id.* at 344–46, 634 *A.*2d 74.

## C.

The outcome of this case turns on the relationships among several parties at the time Pizzi misappropriated his clients' funds.

Obviously, those relationships implicate principles of agency. As noted, the trial court found that the attorney was not the agent of the Title Company at the time of the theft because the agency relationship was created long after the funds were misappropriated. The Appellate Division disagreed.

An agency relationship is created "when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency* § 1.01 (2006) (internal quotation marks omitted). Generally, an agent may only bind his principal for such acts that "are within his actual or apparent authority." *Carlson v. Hannah*, 6 *N.J.* 202, 212, 78 *A.*2d 83 (1951) (citation omitted). Actual authority occurs "when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Restatement (Third) of Agency, supra,* § 2.01. Apparent authority arises "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* § 2.03. The doctrine of apparent authority "focuses on the reasonable expectations of third parties with whom an agent deals." *Id.* § 7.08 comment b. Therefore "a court must examine the totality of the circumstances to determine whether an agency relationship existed even though the principal did not have direct control over the agent." *Sears, supra,* 134 *N.J.* at 338, 634 *A.*2d 74.

We turn now to apply those principles to this case. Here, the Goodmans gave their money to Pizzi in January 2004, and Pizzi misappropriated those funds prior to the time he sought title insurance for the Goodmans. It is not disputed that just prior to the time Pizzi contacted the Title Company no agency relationship existed between Pizzi and the Title Company, nor was there evidence that Pizzi had previously interacted with the Title Com-

pany. Thus, it cannot be argued that the Goodmans relied on Pizzi as a representative of the Title Company.

■ We agree with the Title Company's position that the circumstances that gave rise to an agency relationship in *Sears*— the authorization to the attorney to perform functions on behalf of the Title Company, the ability of the Title Company to control the attorney, the attorney's manifestation of consent to the agency, and the third-party's reliance on the agent's apparent authority to act for the principal—are not present here.[5] *Supra*, 134 *N.J.* at 344–46, 634 *A.*2d 74. When Pizzi applied for title insurance and the Title Company mailed its standard notice and disclaimer to Pizzi, the Title Company was not in a position to prevent the theft because the theft had already occurred. Further, the Title Company never represented to the Goodmans that Pizzi had actual or apparent authority to act on its behalf. Plainly stated, no agency relationship existed between Pizzi and the Title Company at the time the funds were misappropriated. Consequently, the Title Company is not liable for the misappropriation by Pizzi.

## IV.

The judgment of the Appellate Division is reversed. The matter is remanded to the trial court to reinstate the original judgment in favor of the Title Company.

*For reversal/remandment/reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.

---

[5] Given the manner we have decided this case, we need not address the Bar Association's contention that we reconsider the principles of *Sears*. We leave that for another day.