**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0173-16T1

AGIP U.S.A., INC.,
ALCATEL-LUCENT, U.S., INC.,
BASIC INCORPORATED, BP
PRODUCTS NORTH AMERICA INC.,
BUCKEYE PIPE LINE CO., LP,
CHEVRON ENVIRONMENTAL
MANAGEMENT COMPANY,
CHEVRON U.S.A. INC., CONOPCO,
INC., CONSOLIDATED RAIL
CORPORATION, E.I. DU PONT DE
NEMOURS AND COMPANY, ELF
LUB MARINE, U.K., EXXONMOBIL
OIL CORPORATION, FMC CORPORATION,
FOOD HAULERS, INC., MANOR
HEALTH CARE CORPORATION,
MILLER ENVIRONMENTAL GROUP,
INC., NL INDUSTRIES, INC., ORANGE
AND ROCKLAND UTILITIES, INC.,
PHELPS DODGE COPPER PRODUCTS
CORPORATION, PUBLIC SERVICE
ELECTRIC AND GAS COMPANY, TEXACO
INC., THOMAS & BETTS CORPORATION,
VEOLIA ES TECHNICAL SOLUTIONS,
LLC, and WAKEFERN FOOD CORPORATION,

      Plaintiffs-Appellants,

v.

THE PULLMAN COMPANY,

     Defendant-Respondent.

_____

Argued December 19, 2018 – Decided April 20, 2020

Before Judges Ostrer, Currier and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-3530-10.

Paul Francis Carvelli argued the cause for appellants (Mc Cusker Anselmi Rosen & Carvelli PC, attorneys; Paul Francis Carvelli and Alicyn Beth Craig, on the briefs).

Nicole R. Moshang argued the cause for respondent (Manko Gold Katcher Fox, LLP, attorneys; Nicole R. Moshang and Diana A. Silva, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

This is a contract case. Plaintiffs comprise a group of companies (collectively, "the Borne Group") that entered into a 2008 contract to share costs to investigate and remediate a polluted property in Elizabeth, known as the "Borne Site."[1] Plaintiffs contend that defendant, The Pullman Company, is a

---

[1] Although the site is named for the defunct Borne Chemical Company that once operated there, plaintiffs include firms that the New Jersey Department of Environmental Protection asserted had discharged or were in any way responsible for hazardous substances there. See N.J.S.A. 58:10-23.11f.

party to the 2008 contract, and agreed to assume 15.5 percent of Phase I remediation costs and nineteen percent of certain other costs; but Pullman refused to pay its share of those costs as they became due. The general counsel of another company, Mark IV Industries, Inc. (MIV), executed the 2008 contract on Pullman's behalf, without obtaining Pullman's express consent. After a bench trial, Judge Kenneth J. Grispin found that Pullman did not authorize execution of the contract, and entered an order of no cause on plaintiffs' contract claim. We affirm.

We presume the reader's familiarity with the extensive documentary and trial record; the parties' stipulated facts; and the summary of witnesses' testimony found in Judge Grispin's opinion. On its face, the 2008 contract identified MIV as a party, not Pullman; and the contract allocated the shares of clean-up costs to MIV, not Pullman. In 1996, through a subsidiary, MIV bought the business assets of a Pullman division. MIV's subsidiary assumed various environmental liabilities of Pullman or its subsidiaries at multiple sites, including the Borne Site; and MIV guaranteed its subsidiary's performance through a separate indemnification agreement.[2] MIV agreed to defend and

---

[2] In light of that agreement between MIV and its subsidiary, we will hereafter refer to the subsidiary as MIV, for ease of reference.

A-0173-16T1

indemnify Pullman for any environmental liabilities related to those sites. Pullman retained liability for natural resource damage claims; and MIV's liability was capped at $100 million, minus its subsidiary's value.

The 2008 agreement was not the first involving the site and Pullman or one of its subsidiaries. Before the 1996 Pullman-MIV asset-purchase agreement, Peabody International Corporation (Peabody), a Pullman subsidiary, agreed to pay the Borne Group $750,000, on behalf of itself and its subsidiary, Peabody Clean Industry, Inc. of Massachusetts (PCIM). A PCIM predecessor had once actually operated at the Elizabeth site. But, Peabody denied liability for further contributions and refused to participate in the Borne Group's clean-up efforts.

The Borne Group later sued Peabody and PCIM seeking a declaratory order that they shared liability for additional clean-up costs under the New Jersey Spill Compensation and Control Act (the Spill Act), N.J.S.A. 58:10-23.11 to -23.11z. Notably, the Borne Group did not sue Pullman. After the 1996 Pullman-MIV asset-purchase agreement, Pullman tendered the declaratory judgment defense to MIV. Pullman's outside lawyers sent to MIV's outside lawyer files pertaining to the Borne site and others, "for the purpose of representing Pullman's . . . interests" related to the liabilities assumed in the

4

asset-purchase transaction.  Pullman did not follow up on MIV's handling of the matter.

MIV's outside lawyer entered an appearance on Peabody's behalf.  After participating in mediation, she executed a consent order of dismissal as attorney for Pullman; and MIV executed a 1998 settlement agreement that expressly identified Pullman as a party and obligated Pullman to pay nineteen percent of remedial investigatory costs.  The attorney did not notify Pullman or obtain its consent to do so.

Over the years, MIV's outside lawyer and other MIV employees or agents attended meetings with representatives of the Borne Group.  In 2003, MIV's outside lawyer executed, in Pullman's name, an amendatory agreement that identified Pullman as a party and authorized members, including Pullman, to take additional steps in the clean-up process.  MIV did not seek Pullman's approval before it executed the 2003 amendment.

MIV paid all assessments arising under the 1998 and 2003 agreements.  But, shortly after executing the 2008 agreement, MIV stopped paying and declared bankruptcy.  Plaintiffs then turned to Pullman for payment.  In their complaint, plaintiffs sought recovery both under the 2008 agreement, and the Spill Act, which provides dischargers a right of contribution against "other

dischargers and persons in any way responsible for a discharged hazardous substance." N.J.S.A. 58:10-23.11f(a)(2)(a).

The trial court dismissed the Spill Act claim on Pullman's motion for summary judgment, finding that any liability of Pullman's subsidiaries did not pass through to Pullman. Thus, if the contract were enforced, it would oblige Pullman to contribute significantly – plaintiffs claimed Pullman's share exceeded $2 million – to remediate a site for which it was otherwise not responsible. The court conducted a trial to determine whether Pullman authorized MIV to bind it in the 2008 agreement.

After trial, Judge Grispin concluded in a thorough, written opinion that MIV and its outside attorney lacked actual or apparent authority to bind Pullman to the 2008 contract. The court credited the testimony of MIV's outside attorney, and an outside attorney for Tenneco, which became Pullman's parent shortly after the Pullman-MIV asset purchase agreement. Both testified that the intent of the asset-purchase agreement was to authorize MIV to accept liability on behalf of Pullman, so long as MIV actually paid the related costs; however, MIV lacked authority to bind Pullman to future payments without Pullman's consent. The court found that the Pullman-MIV asset-purchase agreement required MIV to obtain Pullman's consent prior to executing the 2008 agreement, which it did

6

not do.  The judge also rejected plaintiffs' claim that Pullman ratified MIV's and its attorney's action.  The judge did not expressly decide whether, had there been authority, the contract would have bound Pullman, notwithstanding that it identified Mark IV as the obligated party.[3]

Plaintiffs appeal only the order disposing of their contract claim.  They argue the court misread the MIV-Pullman asset-purchase agreement and misinterpreted various Pullman-MIV communications, which they contend authorized MIV to bind Pullman.  Plaintiffs also contend the court mistakenly interpreted and weighed the trial testimony and documentary evidence.  But for these errors, plaintiffs argue the court should have found both authority and ratification, warranting judgment in their favor.

We are unpersuaded.  In many respects, plaintiffs ask us to reweigh the evidence.  That, we will not do.  State v. Locurto, 157 N.J. 463, 470-71 (1999) (citation omitted).  We shall not disturb Judge Grispin's factual findings, as we are not "convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the

---

[3]  At the summary judgment motion hearing, the judge held that there were genuine issues of fact as to whether the parties intended to bind only MIV, or whether MIV was inserted in the 2008 contract by mistake or MIV and Pullman were used interchangeably.

A-0173-16T1

interests of justice." Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974) (citation omitted); see also Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). We also discern no error of law, which we review de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Plaintiffs bore the burden to establish that MIV's outside attorney had actual or apparent authority to bind Pullman to the 2008 agreement. See Restatement (Third) of Agency § 1.02 cmt. d (Am. Law. Inst. 2006) (stating that "[t]he party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence.").[4]

We turn first to actual authority. "Actual authority occurs 'when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.'" N.J. Lawyer's Fund for

---

[4] We have previously stated that attorneys are presumed to have authority to enter stipulations of settlement of an action in court, and "the party asserting the lack of authority" bears the burden to show that his or her "'attorney acted without any kind of authority in agreeing to the entry of judgment in the trial court.'" Jennings v. Reed, 381 N.J. Super. 217, 231 (App. Div. 2005) (quoting Sur. Ins. Co. of Cal. v. Williams, 729 F.2d 581, 583 (8th Cir. 1984)). However, the 2008 agreement did not resolve ongoing litigation, nor was it entered in court.

A-0173-16T1

<u>Client Prot. v. Stewart Title Guar. Co.</u>, 203 N.J. 208, 220 (2010) (quoting <u>Restatement (Third) of Agency</u> § 2.01).

There is ample evidence in the record that Pullman, through its outside and in-house counsel, actually authorized MIV and its outside counsel to defend it in the declaratory judgment action. That authority is found in the transmittals to MIV's counsel, and the asset-purchase agreement's express terms. In particular, the asset-purchase agreement required MIV to "assume and be responsible for" any environmental liabilities of Pullman or its subsidiaries at the Borne site; and the agreement stated that MIV "shall assume direction and control of all participation activities and litigation related to the site."

However, parties may agree in writing to restrict or qualify actual authority. <u>See</u> <u>Restatement (Third) of Agency</u> § 8.07 cmt. a (". . . an agent's duties of performance to the principal are subject to the terms of any contract between them."). The asset-purchase agreement qualified MIV's actual authority by requiring Pullman's prior consent if the settlement involved "non-monetary damages." The asset-purchase agreement stated: "the Indemnifying Party [MIV] shall not settle a claim for <u>non-monetary damages</u> without the prior written consent of the Indemnified Party [Pullman], which consent shall not be unreasonably withheld." (Emphasis added). The key issue is whether the 2008

agreement imposed "non-monetary damages." If it did, then MIV's outside attorney lacked actual authority to bind Pullman to the 2008 agreement, because MIV did not obtain Pullman's prior consent.

On its face, the term "non-monetary damages" is internally inconsistent. "Damages" is defined as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." Black's Law Dictionary (9th ed. 2009) (emphasis added). If "non-monetary" refers to the absence of money, then "non-monetary damages" means "non-money money." That would be absurd.

In the same paragraph, the asset-purchase agreement also refers to "money damages" and "other money payments." Pullman was entitled "at its own cost and expense, to defend" any claim "if there is a reasonable probability that [the] Claim may materially and adversely affect [Pullman or its subsidiaries] other than as a result of money damages or other money payments," and the agreement entitled Pullman to compromise or settle such claims with MIV's consent. (Emphasis added). Evidently, "money damages" are different from "other money payments," and the latter include "non-monetary damages."

Judge Grispin concluded that the 2008 agreement imposed "non-monetary damages." The judge credited Tenneco's outside attorney, who interpreted the asset-purchase agreement to require consent for any settlement that involved a

continuing payment or a promise to pay money in the future. He also credited MIV's outside attorney's understanding that she had authority to settle cases, as long as MIV was solely responsible for payment. The court found that the 2008 agreement required the parties' continuing cooperation, as well as MIV's continuing cooperation with the Borne Group and a promise to make continuing future payments to support clean-up activities and Borne Group operations. The court concluded that MIV needed Pullman's consent to enter that sort of executory contract.

Plaintiffs do not offer a satisfactory explanation for "non-monetary damages." Without referring to any case or statute, plaintiffs assert that the 2008 agreement did not involve "non-monetary damages" simply because it entailed, ultimately, the payment of money. That position would read the "non-monetary" modifier out of the agreement. However, courts are loath to treat contract language as surplusage. Rather, "'all parts of the writing, and every word of it will, if possible, be given effect.'" Washington Const. Co. v. Spinella, 8 N.J. 212, 217-18 (1951) (quoting 9 Williston on Contracts (Rev. ed.), sec. 46, p. 64).

In some jurisdictions, "non-monetary" in the phrase "non-monetary damages" describes not the form of compensation, but the harm for which compensation is due. Pennsylvania law defines "non-monetary damages" as

11

those payable for pain and suffering.  See Robinson v. Upole, 750 A.2d 339, 341 (Pa. 2000).  Virginia's Supreme Court refers to "such non-monetary elements of damages as pain, suffering, deformity, loss of working capacity, and the like." Bradner v. Mitchell, 362 S.E.2d 718, 720 (Va. 1987).  One court has equated "non-monetary damages" with injunctive relief, see DiPasquale v. Milin, 303 F.Supp.2d 430 (S.D.N.Y. 2004), but that is not damages at all.[5]

However, Judge Grispin's interpretation of "non-monetary damages" is more closely related to another accepted definition of "non-monetary" as something that fluctuates or is uncertain in amount.  An accounting dictionary defines a "non-monetary item" as "[a]n asset or liability that does not call for payment or settlement in a fixed sum of money, and whose value is thus free to fluctuate in response to inflation."  Ralph Estes, Dictionary of Accounting (2nd ed. 1998).  Likewise, Black's Law Dictionary defines a "nonmonetary item" as "[a]n asset or liability whose price fluctuates over time."  The 2008 agreement did not oblige MIV (or Pullman, if MIV was inserted by mistake or interchangeably with Pullman) to pay a fixed sum of money; rather, it required payment of 15.5 percent of an undetermined amount of one sort of expenses,

_____

[5]  Although the asset-purchase agreement includes a New York choice-of-law provision, plaintiffs point to no New York precedent to illuminate the contract term.

and nineteen percent of another. In other words, since the liability could change over time, it constituted "non-monetary damages."

As "non-monetary damages" is "susceptible to at least two reasonable alternative interpretations," it is ambiguous, see Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008), and its interpretation is a fact issue, see Michaels v. Brookchester, Inc., 26 N.J. 379, 387-88 (1958). The court, as fact-finder, resolved that interpretative question based on the limited evidence presented. The court's interpretation was also consistent with MIV's outside attorney's own interpretation of her authority. If an "authorization is ambiguous, the agent has authority to act in accordance with what he [or she] reasonably believes to be the wish of the principal even though it is contrary to the principal's actual intent." Lewis v. Travelers Ins. Co., 51 N.J. 244, 251 (1968). The court credited the outside attorney's understanding that she had authority to settle matters only if MIV paid. Plaintiffs have provided no persuasive ground to disturb the court's finding. Therefore, we affirm the trial court's finding that MIV lacked actual authority to bind Pullman to the 2008 agreement.

Plaintiffs' challenge to the court's finding that MIV lacked apparent authority fares no better. "Apparent authority imposes liability . . . because of

actions by a principal which have misled a third party into believing that a relationship of authority does, in fact, exist." Alicea v. New Brunswick Theological Seminary, 244 N.J. Super. 119, 129 (App. Div. 1990). The fact-finder must consider both the principal's acts, and the reasonableness of the third party's response. The fact-finder must decide "whether the principal has by his [or her] voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business uses, and the nature of the particular business, is justified in presuming that such agent has the authority to perform the particular act in question." Wilzig v. Sisselman, 209 N.J. Super. 25, 35 (App Div. 1986) (affirming trial court determination, after bench trial, that there was no apparent authority); see also Basil v. Wolf, 193 N.J. 38, 67 (2007). The principal's acts are those made known to the third party. Wilzig, 209 N.J. Super. at 35. Apparent authority does not arise from "the secret instructions of the principal nor [is it] enlarged by the unauthorized misrepresentations of the agent." Ibid. "An agent's success in misleading the third party as to the existence of actual authority does not in itself make the principal accountable." Restatement (Third) of Agency § 2.03 cmt. c.

Also, the third-party's reliance must be reasonable and prudent under the circumstances. "The doctrine of apparent authority 'focuses on the reasonable

A-0173-16T1

expectations of third parties with whom an agent deals.'" N.J. Lawyer's Fund, 203 N.J. at 220 (quoting Restatement (Third) of Agency § 7.08 cmt. b). "Some transactions by their nature should strike a dissonant chord for a reasonable third party, given the situation in which an agent has been placed, the nature of the principal or its activities, or what the third party knows of the agent's position within an organization." Restatement (Third) of Agency § 2.03 cmt. d (discussing "reasonable belief" of third party). Apparent authority may not arise from "the carelessness and indifference of the third party." Wilzig, 209 N.J. Super. at 35. A fact-finder must consider the totality of the circumstances to determine whether apparent authority exists. N.J. Lawyer's Fund, 203 N.J. at 220.

To support their apparent authority claim, plaintiffs contend that they reasonably relied on MIV's attorney's appearance in the declaratory judgment action. No doubt, that appearance resulted from Pullman's actions. However, the lawsuit was filed against Peabody and PCIM, not Pullman. In any event, tendering a defense to MIV is not the same as authorizing MIV to bind Pullman to a settlement.

Other facts undermine the apparent authority claim. Prior to the declaratory judgment action, Pullman's prior outside counsel had steadfastly

refused to join the Borne Group or to assume liability; Pullman paid $750,000 without further obligation. The initial draft of the 1996 settlement agreement that the Borne Group's attorney drafted obligated Peabody, not Pullman, evidencing the attorney's understanding that the MIV lawyer was at most representing Peabody. MIV's outside lawyer independently decided to insert Pullman in the 1998 agreement. As Judge Grispin noted, Pullman never directly communicated with the Borne Group or its attorney. Pullman did not participate in the mediation that led to the declaratory judgment action settlement. Thereafter, checks came from MIV, not Pullman.

With regard to reasonable reliance, Judge Grispin found that the Borne Group's attorney "never questioned the blurred lines between Pullman/Mark IV." The court found that the attorney "had no obligation to 'look behind' [the MIV's attorney's] signature to determine that there was authority for her to sign as she did," because it was "commonplace" for parties and their names to change, and MIV was paying. The court concluded that the attorney was "understandably unconcerned, as long as Mark IV was paying the bills."

However, that lack of concern constitutes the kind of "indifference" from which apparent authority may not arise. See Wilzig, 209 N.J. Super. at 35. Although the Borne Group attorney's lack of concern about corporate identities

may have been "understandable" when the checks were forthcoming, plaintiffs failed to demonstrate that it was objectively reasonable to conclude that MIV's general counsel had authority to sign the 2008 agreement on behalf of Pullman, an entirely separate corporation. That kind of extraordinary transaction should have prompted the Borne Group's attorney to inquire whether Pullman authorized the transaction. See Gen'l Overseas Films, Ltd. v. Robin Int'l, Inc., 542 F.Supp. 684 (S.D.N.Y. 1982) (rejecting claim of apparent authority, as purported agent's execution of a guarantee by one corporation for the debt of an unrelated corporation "was extraordinary and thus sufficient to require inquiry"), aff'd o.b., 718 F.2d 1085 (2d Cir. 1983).

The Borne Group was also aware of litigation in which Pullman challenged MIV's authority to commence a lawsuit purportedly on Pullman's behalf against Pullman's insurers. MIV sought coverage for some of the environmental costs it had assumed. Pullman's objection to MIV's actions should have raised questions in the mind of the Borne Group's attorney as to the scope of MIV's continuing authority. See Restatement (Third) of Agency § 2.03 cmt. d, and Reporter's Note d.

In sum, the issue of whether there exists apparent authority is a factual one for the court. There was sufficient credible evidence in the record to support Judge Grispin's finding against plaintiff.

We need not comment at length on plaintiffs' ratification argument. Plaintiffs point to Pullman's knowledge that MIV responded to the declaratory judgment action in 1996; MIV's outside attorney's involvement in other litigation that it was obliged to defend under the asset purchase agreement; and Pullman's acquiescence after its outside lawyer received a letter from MIV's outside lawyer in 2004 mentioning in passing that Pullman was a Borne Group member.[6] However, all these events cannot constitute ratification, because they preceded the 2008 agreement upon which plaintiffs have sued, and ratification involves "the affirmance of a prior act done by another." Restatement (Third) Agency § 4.01(1).

Furthermore, to establish ratification, plaintiffs were required to prove Pullman knew that MIV had executed the 2008 agreement on Pullman's behalf. See Passaic-Bergen Lumber Co. v. U.S. Trust Co., 100 N.J.L. 315, 318 (E. & A. 1933) (stating party that alleged ratification must prove that the other party "had

_____

[6] Notably, that letter was followed by another, two years later, in which the attorney identified MIV as the Borne Group member.

full knowledge of all the material facts"); <u>Lobiondo v. O'Callaghan</u>, 357 N.J. Super. 488, 499 (App. Div. 2003) (rejecting claim that wife ratified her husband's actions because "there is no testimony that [wife] ever knew that her husband had purported to convey a right of first refusal"). Pullman could not ratify an agreement about which it was ignorant.

In conclusion, the record adequately supports Judge Grispin's finding that MIV lacked actual or apparent authority to bind Pullman to the 2008 agreement; and there was no ratification.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0173-16T1